UNITED STATES of America,
Petitioner-Appellee,

v.

ARTHUR YOUNG & COMPANY,
Respondent-Appellant,

and

Amerada Hess Corporation,
Intervenor-Respondent-Appellant.

Nos. 15, 16, Dockets 81–6048, 81–6056.

United States Court of Appeals,
Second Circuit.

Argued Oct. 26, 1981.
Decided April 13, 1982.

Leona Sharpe, Asst. U.S. Atty., New York City (William M. Tendy, Acting U.S. Atty., S. D. N. Y., David M. Jones, Michael H. Dolinger, Asst. U.S. Attys., New York City, of counsel), for petitioner-appellee.

Carl D. Liggio, Gen. Counsel, New York City (John E. Matson, Richard I. Janvey, Associate Gen. Counsel, New York City, of counsel), for respondent-appellant Arthur Young & Co.

Robert G. Morvillo, New York City (Obermaier, Morvillo, Abramowitz, Milbank, Tweed, Hadley & McCloy, Roger B. Oresman, Russell E. Brooks, John C. Maloney, Jr., New York City, of counsel), for intervenor-respondent-appellant Amerada Hess Corp.

Willkie Farr & Gallagher, New York City (Kenneth J. Bialkin, Louis A. Craco, Howard C. Buschman, III, Diane K. G. Weeks, New York City, of counsel), for amicus curiae American Institute of Certified Public Accountants.

Donald Dreyfus, Chicago, Ill., for amicus curiae Arthur Andersen & Co.

James F. Strother, Chicago, Ill., for amicus curiae Alexander Grant & Co.

Harris J. Amhowitz, New York City, for amicus curiae Coopers & Lybrand.

Allan Kramer, New York City, for amicus curiae Deloitte Haskins & Sells.

Kenneth H. Lang, Cleveland, Ohio, for amicus curiae Ernst & Whinney.

Barry S. Augenbraun, Philadelphia, Pa., for amicus curiae Laventhol & Horwath.

Victor M. Earle, III, New York City, for amicus curiae Peat, Marwick, Mitchell & Co.

Eldon Olson, New York City, for amicus curiae Price Waterhouse & Co.

Richard A. Meyer, New York City, for amicus curiae Seidman & Seidman.

Richard H. Murray, New York City, for amicus curiae Touche Ross & Co.

Before FEINBERG, Chief Judge, and MANSFIELD and NEWMAN, Circuit Judges.

FEINBERG, Chief Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York, Kevin T. Duffy, J., enforcing an Internal Revenue Service (IRS) summons to Arthur Young & Co. (AY). The summons, issued pursuant to 26 U.S.C. § 7602,[1] directed AY to produce all files related to its client, Amerada Hess Corp. (Amerada), for whom AY served as independent auditor. In response to an enforcement proceeding initiated by the IRS, Judge Duffy, in a decision reported at 496 F.Supp. 1152 (S.D.N.Y.1980), ordered the production of all the items requested by the IRS with two exceptions discussed below. The parties consented to a stay of production pending resolution of this appeal. In this court, AY challenges the district court's order, objecting primarily to the request for

1. 26 U.S.C. § 7602 provides in relevant part that:

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry: . . .

its audit workpapers file and for its tax pool (tax accrual workpapers) file. Amerada, utilizing the procedure available under 26 U.S.C. § 7609,[2] has intervened to challenge production of the tax accrual workpapers file. Because we find that the audit workpapers are relevant to determining Amerada's tax liability and thus fall within the scope of the IRS summons power, we affirm that part of Judge Duffy's order requiring their production. However, we reverse that part of the district court order enforcing the summons of the tax accrual workpapers. Although we find that this material is also relevant to the determination of tax liability, we believe that these documents should remain confidential in order to protect the reliability of the independent audit process.

### I.

The involvement of Arthur Young & Co., a firm of certified public accountants, with Amerada Hess Corp. began in November 1971, when AY was retained as Amerada's independent auditor. Among its other duties, AY was responsible for reviewing the financial statements prepared by Amerada in satisfaction of the disclosure requirements of the federal securities law.[3] An AY partner also signed Amerada's tax returns, even though AY did not prepare the returns.

In April 1976, AY became further enmeshed in Amerada's affairs. Around that time, it became known that many American companies had made illegal payments abroad. In response to this publicity, Amerada's board of directors formed a special committee to investigate the possibility of Amerada wrongdoing. The law firm of Milbank, Tweed, Hadley & McCloy, and AY were engaged as independent investigators to assist the committee. This inquiry apparently, and despite the minor nature of the improprieties it uncovered, prompted the IRS in August 1977 to institute a criminal investigation of Amerada's tax returns for the years 1972, 1973, and 1974. Because a regular audit was then in progress, the IRS and Amerada designed a procedure in September 1977 to apprise the corporation of the progress of the criminal investigation. According to their agreement, Special Agent Kenneth Kalemba, who was in charge of the criminal investigation, would issue all summonses relating to that inquiry. In April 1978, a summons signed by Kalemba was issued to AY, requiring it to make all its Amerada files available to the

**2.** 26 U.S.C. § 7609 provides in relevant part that:

    (a) Notice—

        (1) In general.—If—

        (A) any summons described in subsection (c) is served on any person who is a third-party recordkeeper, and

        (B) the summons requires the production of any portion of records made or kept of the business transactions or affairs of any person (other than the person summoned) who is identified in the description of the records contained in the summons,

then notice of the summons shall be given to any person so identified within 3 days of the day on which such service is made . . . .
    . . . .

    (b) Right to intervene; right to stay compliance.—

        (1) Intervention. — Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to intervene in any proceeding with respect to the enforcement of such summons under section 7604.

        (2) Right to stay compliance.—Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to stay compliance with the summons if, not later than the 14th day after the day such notice is given in the manner provided in subsection (a)(2)—

        (A) notice in writing is given to the person summoned not to comply with the summons, and

        (B) a copy of such notice not to comply with the summons is mailed by registered or certified mail to such person and to such office as the Secretary may direct in the notice referred to in subsection (a)(1).

    (c) Summons to which section applies.—

        (1) In general.—Except as provided in paragraph (2), a summons is described in this subsection if it is issued under paragraph (2) of section 7602 . . . .

**3.** See § 12 of the Securities Exchange Act of 1934, 15 U.S.C. § 78*l*, and Regulation S–X, 17 C.F.R. §§ 210 et seq. (1980).

IRS.[4] A quarter of a million pages of documents are involved in this request.

The IRS sought to enforce this summons by an order to show cause, dated October 9, 1979. Judge Duffy tested the summons against the four criteria set forth in *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–255, 13 L.Ed.2d 112 (1964):

> [The Commissioner] must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed. . . .

He found that with the exception of two types of documents, the summons satisfied all the prongs of the *Powell* test and, accordingly, enforced it. The exceptions related to AY's audit program and to the documents prepared by the special committee that investigated Amerada's questionable payments. Judge Duffy held that the audit program was irrelevant because it "stands many steps removed from the question of the actual tax liability." *United States v. Arthur Young & Co.*, 496 F.Supp. at 1157. He found that the committee report was protected by the work-product privilege under the doctrine of *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), since the material was prepared under the auspices of Milbank, Tweed in anticipation of litigation, id. at 1157–58.

The IRS does not appeal this portion of the district court's order. Among the documents that Judge Duffy did order turned over are AY's audit workpapers and tax accrual workpapers. The challenges advanced on appeal relate to these two categories.

## II.

AY alone objects to the production of its audit workpapers. These documents consist almost entirely of factual data generated from the books when accountants verify the financial statements prepared by Amerada's own personnel by spot-checking selected bookkeeping entries and records. They include third-party confirmations of transactions, as well as the auditor's own judgments about the implications of the company's transactions. Some of the workpapers contain material learned during confidential discussions between Amerada and AY employees. This material is not used in preparing Amerada's tax returns.

AY makes two objections to disclosure of these documents. First, it focuses on the second *Powell* criterion—relevance—and it claims that the IRS bears an enhanced burden of showing relevance when it seeks documents from a third-party, that is from an entity other than the taxpayer whose return it is auditing. Thus, AY attempts to distinguish our holding in *United States v. Noall*, 587 F.2d 123 (2d Cir. 1978), cert. denied, 441 U.S. 923, 99 S.Ct. 2031, 60

---

4. The summons requested the following documents relating to Amerada's tax liability for the years 1972–74:

    1. Engagement letter(s)
    2. Management letter(s)
    3. Representation letter(s)
    4. History file(s)
    5. Standard workpaper index(s)
    6. Administrative file(s)
    7. Workpaper review file(s)
    8. Engagement planning file(s)
    9. Confirmation control file(s)
    10. Significant events file(s)
    11. Audit program file(s)
    12. Audit workpaper's file(s)
    13. Tax pool analysis file(s)
    14. File(s) prepared during the course of work performed for the "special committee", including agreed procedures, selection process, reports, schedules and other workpapers.

    15. The name of the partner in charge, engagement partner and/or senior auditor who directed the audit of Amerada . . .
    16. Any other information pertinent to the audit of Amerada . . . covering the years 1972, 1973 and 1974.
    17. All workpapers, reports, records, correspondence, reconciliations and information relative to the United States Corporate Income Tax Returns (Forms 1120) of Amerada . . . that were prepared by [AY] or under the supervision of [AY] for the calendar years 1972, 1973 and 1974.

At about the same time, a summons was issued to Amerada directly. Enforcement of this summons was also litigated, see *United States v. Amerada Hess Corp.*, 619 F.2d 980 (3d Cir. 1980), but none of the parties here contends that the different issues resolved there control the disposition of this appeal.

L.Ed.2d 396 (1979), where a summons forcing a taxpayer to produce its own internal audit workpapers was enforced, on the ground that *Noall* did not involve a third-party. Where, as here, a stranger to the audit is involved, AY argues that this court's opinion in *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1968), controls and it is insufficient for the IRS merely to allege that some chance of relevance exists.

▪ In *Harrington*, the target of the summons was a lawyer who had as his client the ex-wife of the taxpayer in whom the IRS was interested. In the course of enforcing the IRS summons, the court did point out that it was "particularly appropriate" that the lawyer and his client receive "judicial protection against . . . sweeping or irrelevant order[s] . . ." because the demand was "directed not to the taxpayer but to a third-party who may have had some dealing with the person under investigation." Id. at 523. But AY is not a stranger to Amerada's concerns in the same way that lawyer Harrington was to the husband taxpayer in *Harrington*. AY was hired to investigate Amerada's financial affairs, and to involve itself in matters that were likely to be the object of governmental inquiry. We do not believe that *Harrington* dictates the result sought by AY.

Moreover, we do not understand whose interests AY seeks to protect by this claim of an enhanced burden. Amerada does not need this protection: it can intervene in its own behalf under § 7609, see generally, Kenderine, The Internal Revenue Service Summons to Produce Documents: Powers, Procedures, and Taxpayer Defenses, 64 Minn.L.Rev. 73 (1979). And, in fact, it has done so. Since Amerada does not object to production of the audit workpapers, it would be anomalous to deny enforcement on the strength of its accountant's objection. Nor can AY assert any particular burden on it. Judge Duffy carefully protected AY from such possibilities by requiring the IRS to shoulder the costs and to inspect on site, *United States v. Arthur Young & Co.*, 496 F.Supp. at 1160.

▪ Once it is accepted that the usual threshold of relevance applies, it is clear that the audit workpapers pass the *Powell* test. In *Noall*, we rejected a simplistic equation of relevance with use in tax return preparation, and recognized that:

the purposes of the internal audit include the detection of overstatements or understatements of revenues or expenses, and of identifying accounting procedures that would lead to these. If the internal auditors have ascertained an understatement of revenues or an overstatement of expenses, this plainly might throw light on the correctness of the returns.

587 F.2d at 126. AY has advanced no persuasive argument to distinguish between the usefulness of the internal audit procedure at issue in *Noall* and the external audit at issue here. The intervening decision in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), does not change this result. There the Supreme Court held that the accounting methods that a taxpayer uses for his own financial records cannot be dispositive of the accounting method used for tax purposes. But that does not mean that the reliability of the taxpayer's records is not legitimately of interest to the IRS. Tax liability depends on a taxpayer's actual revenue and expenses, not on his bookkeeping. The IRS has an appropriate interest in ensuring that the latter accurately reflects the former.

▪ AY next maintains that the broad, generic document request issued here cannot be tolerated under the Fourth Amendment. The federal courts have repeatedly dealt with similar contentions, and have consistently rejected them. Before the IRS knows where the issues lie, it has no choice but to utilize a general summons. Similarly, before the Service knows what the documents contain, it cannot describe them with any specificity. If the target's own opinion of relevance controlled, the entire audit process would be eviscerated. The judges in this circuit have therefore construed the summons power liberally, and allowed it to extend to widely-sweeping document re-

quests. See, e.g., *United States v. Noall*, 587 F.2d at 127 (rejecting even in camera review as being overly cumbersome); *Foster v. United States*, 265 F.2d 183, 186–187 (2d Cir.), cert. denied, 360 U.S. 912, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1959); *United States v. Acker*, 325 F.Supp. 857, 862–63 (S.D.N.Y. 1971) (Frankel, J.). AY argues that cases such as these do not apply here because it is a third party, not the taxpayer, but we have already rejected that premise on these facts. We therefore affirm that portion of the district court's order requiring AY to turn over the audit workpapers.

### III.

AY is joined by Amerada and a host of amici curiae in challenging the power of the IRS to compel the disclosure of tax accrual workpapers. These documents are generated when an auditor verifies whether the taxpayer has accurately determined its contingent tax liability. Under the federal securities laws, a registrant must file a financial statement of its potential liabilities. Furthermore, the amici tell us that generally accepted auditing standards require an auditor to determine whether his client has put aside enough reserves to cover the contingency that, upon audit, it will owe the government more taxes than originally remitted. To make this assessment, the auditor must not only determine how the taxpayer treated his income and expenses in his tax return; he must also decide whether that treatment comports favorably with the Internal Revenue Code, the Regulations, and the case law. In areas where the law is unclear, he must predict the chances that the taxpayer's position will be upheld by the courts—a judgment based on his knowledge of the law and his opinion of where the law is headed. The auditor must also take into account the likelihood that the client will settle the dispute—a judgment based on the auditor's confidential and intimate knowledge of the client. This process frequently requires the auditor to elicit and engage in speculation as to positions that might be taken by the IRS and taxpayer, theoretical analysis, and opinions bearing on the fairness and reasonableness of the parties' positions (as distinguished from factual transactional data), which, if revealed to the IRS, could seriously prejudice the taxpayer in negotiations with it. If the auditor were required to disclose this material, which is not used in preparation of the taxpayer's return and is not needed by the IRS to determine the correctness of the taxpayer's return, the auditor would probably be inhibited from creating or maintaining such papers as part of a full and frank exchange useful in complying with the taxpayer's obligations under federal securities laws.

The Service's emerging practice of requesting tax accrual workpapers[5] has aroused considerable controversy in the accounting and legal professions,[6] as well as sharp disagreement among the courts that have considered the issue.[7] In this appeal, appellants advance three arguments for denying enforcement to this facet of the summons. First, Amerada vehemently claims that since the summons was signed by Special Agent Kalemba, the relevance of the tax accrual workpapers must be measured

---

**5.** The Service changed § 4024 of its Internal Revenue Manual in June 1979 to insert guidelines for requesting these workpapers. In June 1980, this section was further strengthened, see Caplin, Should the Service Be Permitted to Reach Accountants' Tax Accrual Workpapers? 51 J.Tax. 194 (1979); Caplin, IRS Toughens its Stance on Summoning Accountant's Tax Accrual Workpapers, 53 J.Tax. 130 (1980); I.R.S. Eyes Accountants, 67 A.B.A.J. 1703 (1981). Amerada informs us, however, that in May 1981, the IRS issued new directives, backing down somewhat from its June 1980 position.

**6.** In addition to the articles cited in note 5, supra, see, e.g., Kurtz, et al., Discussion on "Questionable Positions," 32 Tax. Law. 13 (1978); Note, Government Access to Corporate Documents and Auditors' Workpapers: Shall We Include Auditors Among the Privileged Few?, 2 J.Corp.L. 349 (1977).

**7.** Compare *United States v. Arthur Andersen & Co.*, 474 F.Supp. 322 (D.Mass.1979), appeal dismissed as moot, 623 F.2d 720 (1st Cir. 1980), cert. denied, 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483 (1980), with *United States v. Coopers & Lybrand*, 413 F.Supp. 942 (D.Colo.1975), aff'd, 550 F.2d 615 (10th Cir. 1977).

with respect to the criminal investigation that Kalemba was conducting. In other words, Amerada claims that the September 1977 agreement restricts the IRS's right to obtain material to the task of the agent who summoned it.

The short answer to this argument is that Amerada has failed to prove the nature of its agreement with the IRS. We cannot place limits on the broad mandate that § 7602 gives to the IRS with no more than taxpayer's contested assertion that the Service agreed to that limit. A longer answer is that § 7602 is only a power to compel production for the purpose of determining civil liability. Had an iron-clad agreement been forged to restrict the summons to documents pertaining to the criminal investigation, the summons would probably not have been enforceable, see *United States v. La-Salle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). But as that case points out, the agent's personal motivation would not be dispositive in any case. In deciding enforcement issues, the court's mandate is to look to the motive of the "Service in an institutional sense . . . ." Id. at 319, 98 S.Ct. at 2368. Besides, considerations of judicial economy compel us to decide this question on broader grounds: If we denied enforcement only because the documents were irrelevant to Agent Kalemba's purpose, the IRS could simply issue a new summons, and the case would come before us again. Cf. *Hickman v. Taylor*, 329 U.S. at 505, 67 S.Ct. at 390 (declining to insist on "the empty formality of pursuing the right procedural device only to reestablish precisely the same basic problem now confronting us.").

This brings us to a more fundamental inquiry, namely, whether the summoned documents are relevant to the civil audit. Appellants derive considerable support for the proposition that this material is irrelevant from the Tenth Circuit's decision in *Coopers & Lybrand*, supra, and from *United States v. Matras*, 487 F.2d 1271 (1973), where the Eighth Circuit refused to enforce a § 7602 summons for taxpayer's proposed budgets. The reasoning in both cases can be summed up as follows: Tax liability

depends on the taxpayer's actual transactions, not on what the taxpayer thinks and plans. Tax accrual workpapers reflect what the taxpayer—and his accountant—think about transactions that have already taken place; budgets reveal how the taxpayer hopes to conduct his affairs in the future. They are thus both irrelevant to the question of actual transactions, and therefore to the issue of liability for taxes. These courts conceded that both sorts of documents would be convenient to the IRS because they give the Service a "road map" for following the management of the taxpayer's business. They went on to hold, however, that "[t]he term 'relevant' connotes and encompasses more than 'convenience.'" Id. at 1275. Consequently, they refused to require that the documents requested be turned over to the government.

■ We cannot agree with such a restrictive definition of relevance. The summons power has consistently been interpreted as a broad mandate, designed to give the Service the "authority . . . necessary for the effective enforcement of the revenue laws . . . ." *United States v. Euge*, 444 U.S. 707, 715–16 & n.9, 100 S.Ct. 874, 880 & n.9, 63 L.Ed.2d 141 (1980) (enforcing a summons for an examplar of taxpayer's handwriting). See also *United States v. Powell*, supra (refusing to require a showing of probable cause in an enforcement proceeding); *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) (refusing to deny enforcement of civil summons even though potential for criminal prosecution exists); *United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975) (upholding IRS power to issue a John Doe summons). Consequently, we have consistently used as our test of relevance whether the documents requested "might have thrown light upon" the correctness of a return, see, e.g., *United States v. Shlom*, 420 F.2d 263, 265 (2d Cir. 1969), cert. denied, 397 U.S. 1074, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970); *Foster v. United States*, 265 F.2d at 187; *United States v. Noall*, 587 F.2d at 125; *United States v. Acker*, 325 F.Supp. at 862. The documents at issue here certainly

pass this low threshold of relevance. Different tax positions lead to different amounts of liability. It is difficult to say that the assessment by the independent auditor of the correctness of positions taken by the taxpayer in his return would not throw "light upon" the correctness of the return.

Finally, the *Coopers & Lybrand* decision, upon which appellants have relied so heavily, emphasized the fact that the documents requested were not used in preparing the audited returns. This test has been rejected in this circuit, *Noall*, 587 F.2d at 126–27,[8] and accordingly, much of what was persuasive to the Tenth Circuit leaves us unimpressed.

The foregoing reasoning does not mean that the IRS summons in dispute here must now be mechanically enforced, for other considerations also bear on our decision. The Supreme Court has recognized that "contrary legislative purposes" can undercut the "broad latitude" otherwise provided to the IRS, *United States v. Euge*, 444 U.S. at 716 & n.9, 100 S.Ct. at 880 & n.9. It has also recognized that common law privileges serve to limit the scope of the IRS's power, *Upjohn v. United States*, 449 U.S. 383, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981); *United States v. Euge*, 444 U.S. at 714, 100 S.Ct. at 879. We think that the countervailing policies at issue in the case before us require us to fashion protection for the work that independent auditors, retained by publicly owned companies to comply with the federal securities laws, put into preparation of tax accrual workpapers.

■ Our starting point is *Hickman v. Taylor*, supra. In that case, the Supreme Court announced a policy of shielding "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties . . .", 329 U.S. at 510, 67 S.Ct. at 393, not because the documents were "privileged or irrelevant," id. at 509, 67 S.Ct. at 392, but because their "[p]roper preparation . . . is the historical and necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests." Id. at 511, 67 S.Ct. at 393. *Hickman* was decided in the context of discovery under the Federal Rules of Civil Procedure, and the doctrine enunciated there has since been incorporated into Fed.R.Civ.P. 26(b)(3). But neither the Court nor Congress expressed an intent to limit the doctrine to the discovery context, *Upjohn Co. v. United States*, 449 U.S. at 398, 101 S.Ct. at 689. Rather, we read both *Hickman* and Rule 26 as requiring us to balance strong public policies against a party's need for information whenever a conflict between the two arises.

The conflict in this case is between "the legitimate interest of society in enforcement of its laws and collection of the revenues," *Couch v. United States*, 409 U.S. 322, 336, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973), and the "national public interest [in] insur[ing] the maintenance of fair and honest markets in [securities] transactions," 15 U.S.C. § 78b. Congress has protected the former interest by vesting the Service with "the extensive powers granted . . . by the Internal Revenue Code," *United States v. Powell*, 379 U.S. at 56, 85 S.Ct. at 254, including the summons power of § 7602. The latter interest has been vindicated by extensively regulating the securities industry. Foremost among these regulations is the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., which requires public companies such as Amerada Hess to file financial statements, 15 U.S.C. § 78l, verified by independent accountants "in accordance with generally accepted auditing standards," 17 C.F.R. § 210.1–02(d). The verification procedure envisioned by the Act requires, in turn, that management feel free to cooperate with their auditors, and to disclose to them confidential information, such as the questionable positions taken on tax returns, and willingness to settle rather

---

8. It should be noted, however, that the decision in *Noall* specifically left open the issue now before us. 587 F.2d at 127 n.5.

than litigate when these positions are challenged by the IRS. The procedure recognizes that since tax laws must be general enough to treat complex and diverse factual situations, they are necessarily drafted with a great deal of flexibility. The Code's requirements are therefore not always clear, and people of good faith can often take different positions as to the correct answer in a particular circumstance. While it is quite possible that a corporation motivated to save its shareholders' money might take a favorable—i.e. "minimum tax"—position on a debatable item, it is equally true that the Service, which is also composed of mortals, might, in its zeal to maximize revenues, take an equally incorrect "maximum tax" position. We do not agree with the dissent's statement that in the end, the corporation "pay[s] only what the tax laws required it to pay in the first place." This would be true if every difference of opinion were litigated. But the fact is that very few controversies reach that stage. In reality, at the end of an audit, the IRS and the taxpayers frequently compromise out their differences, each giving in a little. Such negotiations strike an appropriate balance between collecting revenue and conserving judicial resources, but requiring the taxpayer alone to disclose settlement positions would improperly weight the balance.

The result of working with a tax code that is not cast in black and white is that the independent auditor is faced with a very sensitive inquiry. In order to assess whether the corporation has set aside enough reserves to pay contingent liabilities, the auditor must pinpoint possibly vulnerable areas in his client's tax return and then predict how the corporation will handle the Service and vice versa, if these areas are questioned on audit. The inquiry necessarily lays bare not only the auditor's thoughts but also the taxpayer's basic thinking, including decisions not to litigate that are based on considerations wholly apart from the inherent legality of what the taxpayer has done, e.g., the cost of litigation and the possibility that confidential information may be disclosed to competitors. Divulging this information necessarily puts the taxpayer-corporation at a substantial disadvantage when it is audited. The prejudice involved in exposing to the Service appraisals of a taxpayer's weaknesses and settlement positions on audit is of such proportions that a prudent organization might not be perfectly candid with independent auditors once it knew that the information revealed would be reachable under § 7602.[9]

■ The case at bar therefore involves much more than delineating the scope of the IRS's authority under § 7602. When the IRS chooses to regularly summon tax accrual workpapers, it creates a clash between two important congressional policies. No matter how we decide this issue, one policy has to bend a bit. Giving the complete latitude to the summons power that the IRS seeks here compromises the procedure designed by Congress to protect the investing public from inaccurate financial information. Protecting the accuracy of the securities laws dilutes the power of the Service to summon a roadmap of the thoughts and theories of a taxpayer and its independent auditor. However, so long as a case does not involve allegations of fraud, the Service does not need to know taxpayer's thoughts. The corporation's own books and the audit workpapers furnish the IRS with all the raw data that it needs to calculate the taxpayer's tax liability. A roadmap would merely save the IRS some time in finding the best arguments for asserting a deficiency. The investing public, on the

9. The government contends that taxpayer's independent duty to comply with the SEC laws is assured by the risk of SEC prosecution, and exposure to civil suit. The full answer to this contention is provided in *Upjohn Co. v. United States,* 449 U.S. at 392 n.2, 101 S.Ct. at 684 n.2:

This response ignores the fact that the depth and quality of any investigations ... would suffer .... The response also proves too much, since it applies to all communications covered by the privilege: an individual trying to comply with the law or faced with a legal problem also has strong incentive to disclose information to his lawyer, yet the common law has recognized the value of the privilege in further facilitating communications.

other hand, relies most exclusively on the data generated as a result of the SEC laws. It therefore seems to us that this collision requires that some form of privilege be carved out to protect the independent auditing process. A work-product privilege, similar to the privilege fashioned in *Hickman*, seems to us appropriate. It protects those who benefit from enforcement of the securities laws from the "grave dangers of inaccuracy and untrustworthiness," *Hickman*, 329 U.S. at 513, 67 S.Ct. at 394, that would result if tax accrual workpapers were routinely revealed to the Service. At the same time, it allows the IRS to procure these documents when the rare situation [10] arises where it can make a sufficient showing of need to adequately justify invading the integrity of the auditing process, cf. *Hickman*, 329 U.S. at 512–13, 67 S.Ct. at 394, Fed.R.Civ.P. 26(b)(3). In reaching this conclusion, we are comforted by the knowledge that if Congress feels that this privilege unduly restricts the IRS's authority, it can require that this material be made available, or that taxpayers flag their questionable positions directly on their returns, in line with the suggestions of former Commissioner Kurtz, 32 Tax Law. at 15–16; Cooper, The Avoidance Dynamic: A Tale of Tax Planning, Tax Ethics, and Tax Reform, 80 Colum.L.Rev. 1553, 1612 (1980). Procuring tax accrual workpapers under § 7602 seems to us to effectuate Commissioner Kurtz's proposals through the back door.

In the case at hand, the IRS has not made a sufficient showing of need to override the privilege. Presumably, Amerada has made its own books available pursuant to the Third Circuit's decision in *United States v. Amerada Hess Corp.*, supra. In addition, this decision directs AY to release its audit workpapers, along with the other papers that the district court required it to turn over. Since the IRS is not attempting to prove that Amerada is guilty of fraud, the documents released should be sufficient for its purpose of determining the accuracy of Amerada's returns.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part.

NEWMAN, Circuit Judge, concurring in part and dissenting in part:

The Court today creates a form of accountant's work-product privilege to shield from scrutiny by the Internal Revenue Service an accountant's tax accrual work papers. These papers, reflecting the accountant's identification of doubtful items on the income tax return of the accountant's corporate client, would be examined by the I.R.S. pursuant to its summons authority, 26 U.S.C. § 7602 (1976), but for today's judicially-created exception. I respectfully dissent from this aspect of the Court's decision,[1] believing that Congress has legislated in favor of such examination, that if Congress has left the question open, the decision to create an accountant's work-product privilege should be made by Congress and not by a court, and that if the merits of such a privilege are to be weighed by a court, we should reject it.

1. In enacting § 7602, Congress has given the I.R.S. a broad summons authority to seek all information "relevant to a legitimate investigative purpose," *United States v. Bisceglia*, 420 U.S. 141, 146, 95 S.Ct. 915, 918, 43 L.Ed.2d 88 (1975). The majority agrees that Arthur Young's tax accrual work papers are relevant to the legitimate investigative purpose of determining the correctness of the tax returns of its client, Amerada Hess Corporation. In the absence of a preexisting privilege, such as the privilege against self-incrimination or the attorney-client privilege, this determination that § 7602 applies should result in enforcement of the summons. The majority does not purport to find anything in the text or legislative history of § 7602 to support an

---

10. See, e.g., Caplin, 51 J.Tax. at 199 (corporate records destroyed by fire).

1. I concur in those portions of Chief Judge Feinberg's opinion upholding enforcement of the summons for Arthur Young's audit work papers and determining that its tax accrual work papers are relevant to the I.R.S.'s civil audit of Amerada Hess Corporation.

exception for an accountant's tax accrual work papers. I do not find anything in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), or Rule 26 of the Federal Rules of Civil Procedure that requires or even permits this Court to depart from the broad command of § 7602.

The Supreme Court has observed that § 7602 is subject to the " 'traditional privileges and limitations,' " *Upjohn Co. v. United States*, 449 U.S. 383, 398, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981), quoting *United States v. Euge*, 444 U.S. 707, 714, 100 S.Ct. 874, 879, 63 L.Ed.2d 141 (1980), which do not include a privilege for either client communications to an accountant, *e.g., United States v. Wainwright*, 413 F.2d 796, 803 (10th Cir. 1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1970); *United States v. Bowman*, 358 F.2d 421, 423 (3d Cir. 1966), or an accountant's work product, *e.g., United States v. Kelly*, 311 F.Supp. 1216, 1217 (E.D.Pa.1969); *In re Rashba & Pokart*, 271 F.Supp. 946, 948 (S.D.N.Y.1967).[2] In *United States v. Noall*, 587 F.2d 123 (2d Cir. 1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979), we were asked to create an exception for a corporation's own internal audit reports and related work papers on the ground that their disclosure to the I.R.S. would run counter to public policy by inhibiting frank disclosure from corporate employees to internal auditors. In rejecting that argument, we stated, "With respect to enforcement of the tax laws, Congress itself has decided the policy issue, and it is not for the courts to challenge that determination."[3] *Id.* at 126. I

would accept Congress' judgment and enforce the summons fully.

2. If it were thought that the broad command of § 7602 leaves open the issue of whether to create an accountant's work-product privilege for tax accrual work papers, the decision to create such a privilege should be made by Congress. We have been authoritatively instructed not to place restrictions on the scope of § 7602 "absent unambiguous directions from Congress." *United States v. Bisceglia, supra*, 420 U.S. at 150, 95 S.Ct. at 920. I do not share the majority's comfort in knowing that if Congress prefers *not* to maintain an accountant's work-product privilege, it remains free to abolish it. That approach inverts the proper relationship between courts and Congress in this area. Congress has already legislated on the subject of the I.R.S.'s authority to examine relevant information, and it has thus far refrained from restricting the summons authority with any privileges unknown to the common law. If there is to be recognition of new privileges, we should leave that task to Congress. *Cf. City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (presumption of preemption of federal courts' common law role as to subjects on which Congress has legislated). Especially is this the proper approach in matters concerning the tax laws, perhaps the one area of all national legislation in which Congress is most alert to remedy perceived inequities.[4]

3. If we were to enter the policy debate as to whether to create a privilege to protect an accountant's tax accrual work pa-

---

**2.** Federal law does not recognize accountant privileges even when the law of the forum state accords protection. *William T. Thompson Co. v. General Nutrition Corp.*, 671 F.2d 100 (3d Cir. 1982); *FDIC v. Mercantile National Bank of Chicago*, 84 F.R.D. 345, 349 (N.D.Ill.1979).

**3.** I recognize that *Noall* explicitly left open the issue of whether § 7602 authorizes inspection of an accountant's tax accrual work papers, 587 F.2d at 127 n.5. However, several courts, including the District Court in this case, have found the rationale of *Noall* persuasive in upholding an I.R.S. summons for an accountant's tax accrual work papers. *United States v. Riley Co.*, 80–1 U.S.Tax Cas. (CCH) ¶ 9157 (N.D.

Ill. Jan. 8, 1980); *United States v. Arthur Andersen & Co.*, 474 F.Supp. 322, 330 (D.Mass. 1979), *appeal dismissed as moot*, 623 F.2d 720 (1st Cir.), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483 (1980); *cf. In re Grand Jury Subpoenas Duces Tecum Involving Charles Rice*, 483 F.Supp. 1085, 1088 (D.Minn.1979).

**4.** Congress, which annually amends the tax laws, sometimes as to details concerning a single taxpayer, has had notice that federal courts are enforcing I.R.S. summonses for accountant's tax accrual work papers, at least since 1979 when *United States v. Arthur Andersen & Co., supra*, was decided.

pers, the privilege should be rejected. The majority suggests the privilege is needed to ensure that public corporations will be truthful with their accountants in fulfilling their statutory obligations to file financial statements verified by independent accountants. *See* 15 U.S.C. § 78*l* (1976); 17 C.F.R. § 210.1–02(d) (1981). Analogy is drawn to the work-product privilege of attorneys. I am not persuaded by either the argument or the analogy.

The policy argument rests on an indictment of corporate America that I do not accept. The premise is that some corporations are so anxious to minimize their tax payments that they are willing to deceive their accountants concerning the existence of debatable tax items and thereby violate their obligations under the securities laws.[5] Doubtless all corporations are anxious to pay only the minimum taxes required, and, toward that end, many will take favorable positions on debatable items, some of which the I.R.S. will successfully challenge. But even when the I.R.S. prevails, the corporation ends up paying only what the tax laws required it to pay in the first place.[6] I doubt that many corporations will be so anxious to avoid that result that they will conceal these debatable items from their accountants in violation of the securities laws. But if a few are so tempted, courts should not afford them any shield behind which they can increase their chances of avoiding detection that they have not paid either the amount of taxes a court might rule was lawfully required or whatever adjustment might result from a post-audit settlement. In *Noall* we declined to give corporations an opportunity to shield their own audit work papers from I.R.S. scrutiny, despite the argument that employees would be tempted to deceive internal auditors. I see no reason to be more solicitous of corporations when they elect to enter public capi-

tal markets where they are obliged to accept the requirements of complete and honest financial disclosure.

Moreover, the argument that corporate taxpayers will be reluctant to assist in creating records accurately reflecting their contingent tax liabilities proves too much. If that premise were followed, we should insulate from § 7602 all the taxpayer's records supporting his claimed tax liabilities, since their inspection by the I.R.S. frequently results in an upward adjustment of tax payments and the taxpayer therefore has an incentive not to maintain them. It is entirely speculative whether the statutory disclosure obligations of the securities laws present a greater need to create new privileges than do the record maintenance obligations of the tax laws themselves. *See, e.g.,* 26 U.S.C. § 7203 (1976).

Arguably, it is more important to protect the investing public with contingent-tax-liability disclosure obligations than to protect the public revenues with tax-record maintenance obligations and undiminished summons authority, but that is precisely the sort of policy choice to be made by Congress. A legislative hearing is a better forum than this appeal to determine how realistic is the threat that occasional instances of understated contingent tax liabilities that result in additional tax payments will prejudice investor decisions and whether such a threat justifies diminution of tax revenues by preventing the I.R.S. from focusing its limited auditing resources on identified questionable items.

Furthermore, it is far from clear that the absence of an accountant's work-product privilege increases the risk that a corporation would have much success even if it were tempted to default on its disclosure obligations in the area of contingent tax

---

**5.** To the extent that the majority is creating a privilege to encourage communication from the client to the accountant, it is creating a testimonial privilege for the corporation, not a work-product protection for the work of the accountant.

**6.** I assume the majority's privilege will protect an accountant's analysis of potential liability only of a civil nature. An accountant's privilege, no more than the attorney-client or attorney work-product privileges, should surely not insulate on-going attempts by the corporation or its accountants to carry out criminal evasion of taxes.

liabilities. The corporation's independent public accountant has public obligations to assure himself that contingent tax liabilities have been accurately reflected. If the corporation blocks the efforts of the accountant to ascertain the true state of the company's contingent tax liabilities, the accountant would be obliged to decline to certify the financial statements.

This last consideration indicates why the work-product privilege of the attorney is not analogous. The attorney is retained by the client in a completely private relationship, frequently to protect his client against claims of the Government. The work-product privilege assures legitimate privacy to the activity of the attorney in discharging his obligations to the client in vindication of a constitutional right to effective counsel. If the client elects not to make full disclosure to his attorney, the attorney may still undertake the defense; though he may not knowingly abet perjury, he has no obligation to the public to elicit and disclose the true state of his client's affairs. The certified public accountant, however, especially when he certifies financial statements of public corporations, has responsibilities to the public that far transcend his private employment relationship. In preparing and certifying such statements, he is not retained to defend his client against the Government; he is retained to assist his client in complying with government obligations to inform the investing public.

Finally, it is worth noting that privileges generally are created to serve some policy, independent of lawful obligations, that is thought to be impaired in the absence of the privilege. The law does not require spouses to confide in each other, but it nonetheless accords a marital privilege to promote family harmony. Similarly, the law does not require a client to confide in his attorney, but it nonetheless accords an attorney-client privilege to promote the effective assistance of counsel. The majority's privilege for accountants may be the first instance of a court creating a privilege to facilitate compliance with duties already imposed by law.[7]

For all of these reasons,[8] I respectfully dissent from the judicial creation of an accountant's work-product privilege to insulate tax accrual work papers from the scope of § 7602.

7. The majority suggests that the Supreme Court in *Upjohn Co. v. United States, supra,* 449 U.S. at 393 n.2, 101 S.Ct. at 684 n.2, has discounted the significance of a legal obligation of communication and disclosure in determining the scope or existence of a privilege. The footnote in *Upjohn* replied to the argument that the corporate client had an incentive to consult with its attorney and therefore did not need an attorney-client privilege broader than the "control group" test. In declining to restrict an existing privilege because the client had an *incentive* to communicate, the Court had no occasion to assess whether a *legal obligation* to disclose conclusions (here, contingent liabilities) should be ignored in determining whether to create a new privilege to protect underlying details (here, questionable tax items).

8. An additional reason advanced by the majority for favoring an accountant's work-product privilege is to prevent the I.R.S. from obtaining "back door" implementation of the suggestion of former I.R.S. Commissioner Jerome Kurtz that taxpayers should flag their questionable tax items. Kurtz, et al., *Discussion on "Questionable Positions,"* 32 Tax Law. 13, 15–16 (1978). Whether or not the I.R.S. can or should add such a sweeping self-questioning feature to the self-reporting tax system is fairly debatable. But once the I.R.S. has decided to devote its limited resources to an audit or investigation of a particular taxpayer, it should not be obstructed from concentrating its efforts on questionable items nor barred from identifying such items either by inquiry of the taxpayer and his accountant or, more profitably, by inspection of relevant documents.