UNITED STATES of America and John Pelican, Petitioners,

v.

I.C. INDUSTRIES, INC. and Robert F. Schnoes, Respondents.

No. 82 C 5459.

United States District Court, N.D. Illinois, E.D.

Jan. 12, 1983.

Dan K. Webb, U.S. Atty., Chicago, Ill., James H. Jeffries, III, Robert G. Nath, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for petitioners.

Michael M. Conway, Frederic W. Hickman, Hopkins & Sutter, Chicago, Ill., for respondents.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In this action the United States and Internal Revenue Service ("IRS") Revenue Agent John Pelican ("Pelican") (collectively "petitioners") seek enforcement of an IRS summons issued to I.C. Industries, Inc. ("Industries") and its president and chief operating officer Robert F. Schnoes (collectively "respondents"). Respondents have moved to quash the summons, and petitioners in turn have moved for summary judgment. For the reasons stated in this memorandum opinion and order, respondents' motion is denied and petitioners' is granted.

**220**

## Background

On December 1, 1981 the IRS began a routine examination of Industries' federal income tax liabilities for the years 1977–79. In the course of the examination Revenue Agent Pelican requested a number of documents from Industries. When Industries failed to supply a portion of those documents despite repeated requests, on April 20, 1982 Pelican issued an IRS summons to respondents. What now remains at issue is the summons' directive to produce "management letters" prepared by Industries' independent accountants Peat, Marwick, Mitchell & Co. ("Peat, Marwick") and Industries' replies to these reports.[1]

During the years under examination Industries retained Peat, Marwick to verify that Industries' financial statements comport with generally accepted accounting principles—a certification requirement imposed by a Securities and Exchange Commission regulation (17 C.F.R. § 210.1–02(d)). Peat, Marwick also submitted management letters to Industries: confidential reports that typically convey the accounting firm's assessment of (and recommendation for) its client's accounting procedures and internal controls for safeguarding assets. Management letters may also include comments on business policies and operations.

## Enforceability of the IRS Summons

■ *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) outlines the four parts of the prima facie showing the government must make to obtain judicial enforcement of an IRS summons:

1. The investigation is conducted pursuant to a legitimate purpose.

2. The materials may be relevant to that purpose.

3. The information sought is not already in IRS' possession.

4. All required administrative steps have been followed.

Here respondents dispute petitioners' satisfaction of the second and fourth of those requirements and also contend the requested materials are privileged from production.

More specifically, respondents argue:

1. Management letters are not relevant to IRS' legitimate audit task—the calculation of Industries' tax liabilities.

2. IRS' own guidelines (specifically Internal Revenue Manual § 4024, which applies to accountant's "audit workpapers") forbid compelled disclosure of the management letters (but not Industries' responses), because respondents have failed to make the requisite showing of "unusual circumstances."

3. Under the "accountant's work-product" privilege as recently fashioned by the Court of Appeals for the Second Circuit, *United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir.1982), management letters and Industries' responses are insulated from production.

Because none of respondents' objections withstands scrutiny and the *Powell* standards have been met, petitioners are entitled to summary judgment.

### 1. Relevancy

*Powell's* relevancy standard derives from Internal Revenue Code ("Code") § 7602, 26 U.S.C. § 7602. Section 7602 authorizes the IRS, in the course of an audit, to "examine any books, papers, records, or other data which *may* be relevant or material to such inquiry" (emphasis added). Defining that very low threshold our Court of Appeals has said the "government need only show . . . that the inspection of the desired records *might* throw light upon the correctness of a taxpayer's return." *United States v. Turner*, 480 F.2d 272, 279 (7th Cir.1973) (emphasis added), followed in *United States v. Kis*, 658 F.2d 526, 537 (7th Cir.1981).

Two judges of this District have reached opposite conclusions as to the reachability of management reports. In *United States v. First Chicago Corp.*, 43 A.F.T.R.2d 79–704 (N.D.Ill.1978) Judge Will made passing reference to his prior ruling quashing on relevancy grounds a summons' request for

---

1. Since this action was filed Industries has supplied the other document sought by the summons, a list of its internal audit reports for the years under examination.

the independent accountants' "Reports to Management." In *United States v. Riley Co.*, 45 A.F.T.R.2d 80–1164, 80–1165 (N.D. Ill.1980) Judge Decker found management reports relevant, relying heavily on *United States v. Noall*, 587 F.2d 123 (2d Cir.1978), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979) (ordering production of taxpayer's "internal audit reports," which had identified accounting procedures that misstated revenues and expenses).

■ Given the minimal level of possible relevance required by *Powell* and *Turner-Kis*, this Court concurs in Judge Decker's view. Certainly the management letters (and Industries' responses) could shed light on the correctness of Industries' returns by disclosing any defective accounting procedures that distort the company's financial records. For example a management letter focusing on the company's procedures recording or verifying accounts receivable or accounts payable might highlight inaccuracies in the reported totals of those items. Other instances could but need not be multiplied.[2]

Industries' counter-argument that would require a more specific IRS threshold showing poses obvious chicken-and-egg problems. Without access to the management letters themselves, the IRS can scarcely provide the particulars of actual as distinct from potential relevance—"data which may be relevant or material to such inquiry," as Code § 7602 puts it. Instead the very na-

ture of management letters and their regular subject matter furnishes the requisite nexus to possible tax liability: By definition the data in such documents "may be relevant or material" to such liability, just as there should be no need for a special showing that accounts receivable records (for example) "may be relevant or material." *Accord, Kis,* 658 F.2d at 537 ("Moreover, as the district court correctly found, the description of the items indicated their relevance"). And the possible middle position, under which the burden of determining the actual relevancy of management letters would be placed on this Court, presents the different difficulties identified in *Noall* (see n. 2).[3]

Nor does the asserted public policy encouraging public companies to make full and candid disclosure to their outside accountants dictate a finding of non-relevance, as respondents insist. That contention would effectively require a greater relevancy showing for documents authored (but not necessarily possessed) by the taxpayer's accountants. Nothing in the "might throw light upon" formulation (or the statutory language on which it rests) suggests it should apply differently to documents written by accountants (or for that matter any other third party).[4] *Both* Judge Will and Judge Decker rejected the identical public policy contention in *First Chicago* and *Riley.* As *Noall,* 587 F.2d at 126, put it:[5]

2. This Court has not reviewed the specific management letters sought, instead focusing on the kind of information respondents concede is *generally* contained in such documents. As *Noall* points out, judicial inspection of the desired materials "would be a task which, in most cases,...would be so burdensome and probably so impossible of performance that Congress could not have meant to impose it upon busy district judges." 587 F.2d at 127.

3. Respondents chide the IRS for burdening this Court by issuing and moving for enforcement of the summons (Resp.Mem. 15–16):

> The Service's adamant position of absolute entitlement to everything, coupled with its refusal to consider any accommodation, has forced the judicial system to allocate its precious resources to this dispute.

Just who has "burdened" the Court is of course a totally result-oriented question—presumably the answer is the loser in this lawsuit.

4. It should also be remembered that the documents here in issue were specifically prepared for delivery to the taxpayer, from whom discovery is now sought. On that score *Noall* said (587 F.2d at 126):

> The threshold is particularly low when, as here, the papers at issue are the taxpayer's own and there is no question of the invasion of the privacy of third persons against their will.

5. Indeed, no court has adopted such a bifurcated notion of relevancy. Even the narrow relevancy concept developed in *United States v. Coopers & Lybrand,* 550 F.2d 615, 621 (10th Cir.1977) (confining IRS summons to docu-

With respect to enforcement of the tax laws, Congress itself has decided the policy issue, and it is not for the courts to challenge that determination. In this, as in many other procedural questions, the collection of the revenue stands apart.

### 2. Claimed Noncompliance with IRS Manual

 Respondents' contention that issuance of the summons violated Internal Revenue Manual § 4024 can be easily disposed of. By its own terms Section 4024 applies to "audit workpapers," a term defined in Section 4024.2(2) as encompassing (emphasis added):

> workpapers *retained* by the independent accountant as to the procedures followed, the tests performed, the information obtained, and the conclusions reached pertinent to his/her examination. Workpapers may include work programs, analyses, memorandums, letters of confirmation and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor.

At least three reasons leap from the language of the Manual itself to belie respondents' position:

1. "Workpapers" typically denote the raw materials for the accountants' ultimate judgment—as Section 4024.2(2) says, "workpapers provide an important support for the independent certified public accountant's opinion. . . ." By contrast, management letters are finished products—formal reports to the client of the accountants' judgment.

2. "Workpapers" are defined by Section 4024.2(2) as supporting the "accountant's opinion as to the fairness of the presentation of the financial statements. . . ." As already explained, management letters play a wholly different role—they are not part of the audit process at all.

3. Section 4024.2(2) speaks of "workpapers retained by the independent accountant," a concept confirmed by Section 4024.4's guideline requiring the request to be made first to the taxpayer. Management letters by definition are designed for delivery to the client taxpayer (to whom the summons in this case is directed).

In sum, respondents' effort to distort Section 4024 to embrace management letters as "workpapers" does not deserve even a "nice try" accolade:

 Even were that not the case, any claimed failure of the summons to conform to such IRS guidelines would not render it unenforceable. So long as no constitutional or statutory provisions are implicated, IRS noncompliance with its own internal procedures is not fatal. *See United States v. Arthur Andersen & Co.*, 43 A.F.T.R.2d 79–1161 (2d Cir.1979) (IRS Audit Technique for Internal Revenue Agents was adopted solely for internal administration and thus does not confer any rights on taxpayers); *United States v. Price Waterhouse & Co.*, 515 F.Supp. 996, 999 (N.D.Ill.1981) (construing *Powell* as requiring IRS summonses to comport only with Code-imposed administrative procedures and not those established by IRS' informal guidelines).

### 3. Accountant-Client Privilege

Departing from Supreme Court precedent, the Court of Appeals for the Second Circuit recently forged an "accountant's work-product" privilege to insulate tax accrual workpapers [6] from the summons power of Code § 7602. *United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir.1982). Respondents ask this Court not only to endorse the *Arthur Young* privilege but also to extend it to management letters (and the company's responses).

---

ments "prepared in connection with or used to facilitate the preparation and filing of" the taxpayer's returns)—a concept rejected by our own Court of Appeals—applies across the board, regardless of the source of the documents sought by the summons.

**6.** Internal Revenue Manual § 4024.2(3) defines such documents as "workpapers that reflect the estimate of a company's tax contingency liability."

If such a course were to be charted here, it is not for this Court to mark it out in the first instance. Just a decade ago the Supreme Court, in *Couch v. United States,* 409 U.S. 322, 335–36, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1972), *unequivocally* refused to create an accountant-client privilege. Then the following year our Court of Appeals, in *United States v. Brown,* 478 F.2d 1038, 1040 (7th Cir.1973), acknowledged only a narrow possibility of extending the attorney-client privilege to accountant-client communicators (quoting from the Second Circuit in *United States v. Koval,* 296 F.2d 918, 922 (2d Cir.1961), which had explicitly declined to create an accountant-client privilege):

> If what is sought is not legal advice but only accounting service, . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.

Indeed *Arthur Young* appears to stand alone, for every other Court of Appeals that this Court has found to have considered the issue has refused to create such a privilege: *United States v. El Paso Co.,* 682 F.2d 530, 540 (5th Cir.1982); *Wm. T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 103–04 (3d Cir.1982); *United States v. Gurtner,* 474 F.2d 297, 298–99 (9th Cir.1973); *United States v. Wainwright,* 413 F.2d 796, 803 (10th Cir.1969).

Moreover *Arthur Young* itself does not aid respondents, for it is meaningfully distinguishable from this case. As to tax audit workpapers, *Arthur Young* subordinated IRS' legitimate informational requirements to the investing public's need for accurate financial reporting. In the majority's view, giving the IRS unrestricted access to such workpapers would seriously inhibit a taxpayer from divulging to its auditors the confidential information necessary to calculate its contingent tax liabilities—an important entry in its publicly filed balance sheets.[7] That disclosure disincentive, the

majority reasoned, would stem not so much from the taxpayer's concern that its auditor's appraisal would enable the IRS to identify the taxpayer's questionable tax positions (the IRS could readily determine that on its own) as its fear that the workpapers would reveal the taxpayer's willingness to settle and thereby compromise its ability to negotiate with the IRS.[8]

By contrast, permitting routine IRS access to management letters would not equally dampen the taxpayer's incentive for full disclosure to its independent accountants. No public corporate taxpayer can refuse to apprise its auditor of its accounting procedures, for verification of its financial statements—an SEC requirement—is really impossible without that information. As for information about the company's internal controls for safeguarding its assets, that does not directly serve the public interest in accurate financial reporting—so that the need to balance competing public policies is not at all the same. Finally, unlike tax accrual workpapers, management letters typically do not shed light on the negotiating posture the company would assume if the IRS audit touched on matters discussed in such reports.

■ Accordingly *Arthur Young* does not appear to support the extension of any accountants' work-product privilege to management letters. But it should again be emphasized all the discussion of that topic is really hypothetical. This Court would not be free to disavow the authorities that control its decision even were it inclined to do so—and it is not.

*Conclusion*

Both sides have agreed, and this Court finds, there is no genuine issue of material fact.[9] Petitioners are entitled to a judg-

---

7. Because that justification relates to communications *between* the client and its accountant, the resultant privilege should not—technically speaking—be called a *work-product* privilege. See *Arthur Young,* 677 F.2d at 223 n. 5 (Newman, J., dissenting).

8. Moreover withholding such information, which is wholly unrelated to "the inherent legality of what the taxpayer has done" (677 F.2d at 220), does not appear to detract from the policies underlying IRS' summons authority.

9. As the text discussion makes plain, this Court has found it unnecessary to consider the affida-

ment as a matter of law, their motion for summary judgment is granted and respondents are ordered to deliver the management letters and responses thereto, as referred to in the summons. Respondents' motion to quash the summons is of course denied.

vits tendered by petitioners and sought to be stricken by respondents. They would plainly fortify the conclusions independently reached here.