MERRILL LYNCH & CO., INC.; Merrill Lynch Capital Services Inc.; and ML IBK Positions, Inc., Plaintiffs,

v.

ALLEGHENY ENERGY, INC. Defendant.

Allegheny Energy, Inc.; and Allegheny Energy Supply Company, LLC., Counterclaim Plaintiffs

v.

Merrill Lynch & Co., Inc.; and Merrill Lynch Capital Services Inc.; Counterclaim Defendants.

No. 02 Civ. 7689(HB).

United States District Court, S.D. New York.

Nov. 25, 2003.

John Gueli, Stuart Jay Baskin, Shearman & Sterling, L.L.P., New York City, for Plaintiffs.

Alan Ross Arkin, Hyman L. Schaffer, Stanley S. Arkin, Arkin, Schaffer & Kaplan, L.L.P., New York City, Daniel E. Morrison, David C. Bohan, Jonathan S. Polish, Sachnoff & Weaver, Chicago, IL, for Defendant.

### OPINION & ORDER

BAER, Senior District Judge.

Counterclaim defendants Merrill Lynch & Co., Inc. ("ML & Co.") and Merrill Lynch Capital Services, Inc. ("MLCS") (collectively, "Merrill Lynch" or "counterclaim defendants") move to dismiss each of the four counterclaims asserted by counterclaim plaintiffs Allegheny Energy, Inc. ("Allegheny Energy") and Allegheny Energy Supply Co., LLC ("Allegheny Supply") (collectively "Allegheny" or "counterclaim plaintiffs") or, in the alternative, strike the counterclaims. For the following reasons, Merrill Lynch's motion is granted in part and denied in part.

### I. BACKGROUND

In late 2000, Allegheny Energy, which provides retail electric and natural gas services to residents of several mid-Atlantic states, sought to acquire an energy-commodities trading business in order to expand the trading business subsidiary Allegheny Supply. It obtained the assistance of the counterclaim defendants as consultants but soon it was suggested to Allegheny that it need look no further as it could acquire the counterclaim defendants' energy-commodities trading business known as Global Energy Markets ("GEM"). Allegheny alleges that Merrill Lynch, as Allegheny's longtime financial advisor and as a leading investment bank with significant experience in the energy industry, knew that Allegheny would find GEM attractive,

because GEM, which was seemingly a hugely successful business, would enable Allegheny to increase its energy commodities trading capabilities and leverage its existing generation base. Allegheny alleges that Merrill Lynch's explanation of its willingness to sell this successful business was that GEM needed generation capabilities of its own in order to continue to grow and that Merrill Lynch was not willing to acquire such generation capabilities. Because this explanation seemed reasonable, Allegheny began to discuss with Merrill Lynch the possible acquisition of its GEM business. When Allegheny' began to focus on GEM, Merrill Lynch withdrew as Allegheny's advisor, and Allegheny turned to another advisor.

On September 1, 2000, the parties executed a Confidentiality Agreement which governed the parties' use and exchange of "Evaluation Material"—*i.e.,* information requested in connection with the consideration of the transaction and "any other information ... furnish[ed] ... whether before or after the date of this Agreement, together with any reports, analyses, compilations, memoranda, notes and any other writings prepared by" the other party. This Confidentiality Agreement, which survived the Purchase Agreement, also provided:

> Each party acknowledges that although the other party will endeavor to include in the Evaluation Material information known to it which it believes to be relevant for the purpose of investigation, neither party makes any representation or warranty as to the accuracy or completeness of the Evaluation Material and that only those representations and warranties made in a definitive agreement, if any, shall have any legal effect. Each party agrees that other than as may be set forth in such definitive agreement, neither the other party nor its Representatives shall have any liability to it or any of its Representatives, including,

without limitation, in contract, tort or other federal or state securities laws, resulting from the use of the Evaluation Material supplied by such other party or its Representatives.

In September 2000, at which time Merrill Lynch no longer served as Allegheny's advisor, Merrill Lynch made several presentations to Allegheny Energy about GEM. Allegheny Energy alleges that Merrill Lynch, in order to rid itself of GEM which in reality faced several significant internal problems, touted GEM's capabilities and infrastructure, its financial condition, and the qualifications of its personnel. First, Allegheny Energy alleges that Merrill Lynch repeatedly and aggressively portrayed GEM's financial performance and its potential for continued growth and presented data which showed that GEM's revenues and trading volume were legitimate and expected to continue to grow. Second, Merrill Lynch represented that GEM had internal control mechanisms and risk-management infrastructure, such as GEM's state-of-the-art trading systems and its significant accounting and controller systems. Allegheny Energy alleges that these representations were intended to convey that GEM's activities were closely monitored and that its trades were proper as well as in conformity with legal and accounting standards. Third, Merrill Lynch represented that GEM had carefully assembled a top-notch group, headed by Daniel Gordon, whom Merrill Lynch held out as highly experienced and highly qualified and a most valuable of GEM's assets.

■ Pursuant to an Asset Contribution and Purchase Agreement (the "Purchase Agreement") executed on January 8, 2001, Allegheny, which was represented by Sullivan & Cromwell in connection with the transaction, purchased GEM from Merrill Lynch in the spring of 2001 for $490 million in cash and a 2% equity interest in

Allegheny Supply. In the Purchase Agreement, Merrill Lynch made several representations and warranties, including that "[t]he information provided by Sellers to Purchasers, in the aggregate, includes all information known to Sellers which, in their reasonable judgment exercised in good faith, is appropriate for Purchasers to evaluate the trading positions and trading operations of the Business," that "[t]he Business Selected Data has been prepared in good faith by the management of the Business based upon the financial records of the Business," and that "the Sellers are conducting the Business in compliance in all material respects with all applicable Laws." Allegheny contends that in reality and unbeknownst to it, Merrill Lynch sought to "rid itself of a troubled business that was saddled with 'wash,' 'round trip,' or other sham energy trades, and that was run by personnel that it knew had engaged in highly questionable—if not outright criminal—business practices."

After its acquisition of GEM, Allegheny soon realized that GEM's financial performance was based in part on sham trades with Enron (and perhaps others) and that Gordon employed highly questionable, if not criminal, business practices—facts which Merrill Lynch misrepresented and/or concealed. Allegheny alleges that because Enron was an important client, Merrill Lynch acceded to a proposal by Enron in December 1999 whereby Merrill Lynch, through GEM, assisted Enron to book several million dollars of profit from sham energy trades—trades where the two firms exchanged equivalent contracts which es-sentially cancelled each other out but which also inflated revenues and trading volume. (These transactions were eventually unwound in June 2000.) In addition to earning substantial fees on these transactions, Merrill Lynch further benefited because the transactions created a falsely rosy picture of GEM's trading volumes and financial position. With respect to Gordon, Allegheny alleges that Merrill Lynch suspected but kept secret that Gordon had perpetrated a $43 million fraudulent trade at GEM. This scheme involved an agreement which Gordon engineered between Merrill Lynch and/or GEM and Falcon Energy Holdings S.A. ("Falcon Energy"), an Anguilla-based corporation that Allegheny believes Gordon owns or controls, whereby Merrill Lynch purchased a "unit contingent call option" for which Merrill Lynch paid up-front a "reservation fee" of $43 million. Allegheny alleges that Merrill Lynch conducted an investigation into this trade and concluded it was likely improper and/or illegal. Gordon is now the subject of a criminal investigation for his involvement in this scheme.

Merrill Lynch brought a lawsuit on September 24, 2002 to enforce a provision in the Purchase Agreement, which Allegheny refused to honor.[1] Allegheny brought a claim against Merrill Lynch in New York State court which is proceeding in parallel,[2] and subsequently interposed counterclaims against Merrill Lynch for rescission, fraudulent inducement, breach of contract, and breach of fiduciary duty.

---

1. The Purchase Agreement provided that if Allegheny Energy did not contribute certain generation assets to Supply by September 16, 2002, Merrill Lynch had the right to "put" its equity position in Supply back to Allegheny Energy for $115 million. Allegheny Energy informed Merrill Lynch prior to this September 16 deadline that it would not contribute the generation assets to Allegheny Supply, as required.

2. On October 17, 2002, Allegheny moved to stay or dismiss the case brought by Merrill Lynch here in federal court. This motion was denied on May 30, 2003.

Merrill Lynch moves to dismiss, or alternatively, strike each of Allegheny's four counterclaims.[3] In addition, Merrill Lynch contends that Allegheny's claim for punitive damages should be dismissed and that their demand for a jury should be stricken.

## II. DISCUSSION

### A. Standard of review

For the purposes of ruling on the 12(b) motion to dismiss, all well-plead factual allegations are taken as true, and all reasonable inferences are construed in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 52 (2d Cir.1996). Dismissal of the complaint is appropriate only when it appears that the plaintiff cannot prove a set of facts "in support of his claim which would entitle him to relief." *Gant v. Wallingford Board of Education,* 69 F.3d 669, 673 (2d Cir.1995).

### B. Counterclaim for fraudulent inducement

■ In its counterclaim, Allegheny alleges that Merrill Lynch misrepresented GEM's internal controls, its infrastructure, its historical revenues, its trading volume, its growth rate, and the qualifications of Gordon. Merrill Lynch contends that Allegheny's counterclaims for fraudulent inducement should be dismissed because the alleged misrepresentations are not in Article III of the Purchase Agreement and the Purchase Agreement provid-

ed that only those representations and warranties in Article III had any legal effect.[4] Also, the Purchase Agreement contains a standard merger clause.[5] In addition, the Confidentiality Agreement provided that "neither party makes any representation or warranty as to the accuracy or completeness of the Evaluation Material and that only those representations and warranties made in a definitive agreement, if any, shall have any legal effect." Merrill Lynch contends that given the disclaimer and the merger clause in the Purchase Agreement and the disclaimer in the Confidentiality Agreement, both of which documents were negotiated between sophisticated parties represented by counsel, Allegheny relied at its peril on any representations not included in the Purchase Agreement and that this lack of reasonable reliance is fatal to a claim for fraudulent inducement, whether the remedy is rescission or money, and negligent misrepresentation.[6] Allegheny advances two theories to get their claim for fraudulent inducement around the provisions in the Purchase Agreement and the Confidentiality Agreement: First, they contend a general, non-specific disclaimer does not bar a fraudulent-inducement claim, and second, the matters misrepresented were peculiarly within Merrill Lynch's knowledge.

■ As the Second Circuit noted, "Where sophisticated businessmen en-

---

**3.** After Merrill Lynch submitted this motion, Allegheny filed an amended complaint which added a fifth cause of action for negligent misrepresentation.

**4.** Section 3.19 provides: "Except for the representations and warranties contained in this Article III, neither the Sellers nor any other Person make any express or implied representation or warranty on behalf of or with respect to the Sellers, the Business or the Purchased Assets, and the Sellers hereby disclaim any representation or warranty not contained in this Article III."

**5.** Section 11.05 provides that the Purchase Agreement shall "constitute the entire agreement of the parties hereto with respect to the subject matter hereof ... and supercede all prior agreements and undertakings, both written and oral, between the Purchasers and the Sellers ... other than the Confidentiality Agreement."

**6.** The only element of a claim for fraudulent inducement that Merrill Lynch contests is reasonable reliance.

gaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 737 (2d Cir.1984). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003). It is settled in New York that "Where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed." *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 155 (2d Cir.1995) (quoting *Grumman Allied Indus. Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 734–35 (2d Cir. 1984)). However, a "disclaimer is generally enforceable only if it 'tracks the substance of the alleged misrepresentation....'" *Caiola v. Citibank, N.A.,* 295 F.3d 312, 330 (2d Cir.2002) (quoting *Grumman Allied,* 748 F.2d at 735). As Merrill Lynch concedes, the disclaimer at issue here is general and does not track the substance of the alleged misrepresentations—*i.e.,* it does not state that Merrill

Lynch disclaims any prior representations about the Enron transactions or Gordon's qualifications. Nevertheless, there is considerable authority for Merrill Lynch's position that this general disclaimer, which was between sophisticated entities negotiated at arms' length, should nevertheless be given effect and deprive Allegheny of a claim for reasonable reliance on any other representation—especially where the agreement enumerates representations in detail and contains a merger clause. *See, e.g., Harsco Corp. v. Segui,* 91 F.3d 337, 345–46 (2d Cir.1996); *Consolidated Edison, Inc. v. Northeast Utilities,* 249 F.Supp.2d 387, 401 (S.D.N.Y.2003) ("In this case, the specific disclaimer in the Confidentiality Agreement combined with the merger clause in the Merger Agreement defeat any claim of reasonable reliance on the alleged oral statements in the course of due diligence and the written August Policies.").[7] In *Harsco,* the Court explained:

> [R]elying on the sophisticated context of this transaction, we hold that Harsco must be held to its agreement.... We think Harsco should be treated as if it meant what it said when it agreed in Section 2.05 that there were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction. [T]he exhaustive nature of the Section 2.04 representations adds to the specificity of Section 2.05's disclaimer of other representa-

---

**7.** *Consolidated Edison,* a recent decision by Judge Koeltl, involved a fact pattern and arguments very similar to the ones raised here. In connection with ConEd's attempt to purchase Northeast Utilities, the parties executed a confidentiality agreement, which like here disclaimed reliance on any representation or warranty made in the course of due diligence. *See Consolidated Edison,* 249 F.Supp.2d at 392, 400. After the parties conducted due diligence, they executed a merger agreement which included numerous representations by

each party. *See id.* at 396. As here, the confidentiality agreement there provided in part that "[n]either Party makes any representation or warranty, either express or implied, as to the accuracy or completeness of any Evaluation Material...." However, unlike the Confidentiality Agreement at issue here, the disclaimer there expressly stated that neither party may rely on the evaluation material: "Each Party agrees that it is not entitled to rely on the accuracy or completeness of the Evaluation Material...."

tions. We can see no reason not to hold Harsco to the deal it negotiated.

*Harsco,* 91 F.3d at 346; *see also id.* ("Under the circumstances of this case, 'no other representations' means no other representations.").

Despite the general hostility of courts to claims by sophisticated business entities for fraudulent inducement, under the standards applicable at this stage of the litigation, I am unwilling to conclude as a matter of law that Allegheny's reliance on these alleged misrepresentations was unreasonable. Most significantly, the agreements in the cases that Merrill Lynch relies on placed the burden on the buyer to perform its due diligence and to ensure that the representations in the final agreement covered known or readily knowable risks. Here, the Purchase Agreement places at least some of that burden on Merrill Lynch, *e.g.,* "all information known to Sellers which, in their reasonable judgment exercised in good faith, is appropriate for Purchasers to evaluate the trading positions and trading operations of the Business." Also significant is the fiduciary relationship, which, though terminated when the alleged misrepresentations and/or omissions were made, had existed until shortly before the representations. Finally, Allegheny Energy has alleged that the information was peculiarly within Merrill Lynch's knowledge. *See Banque Arabe,* 57 F.3d at 155 ("[E]ven such an express waiver or disclaimer 'will not be given effect where the facts are peculiarly within the knowledge of the party invoking it.' ") (quoting *Stambovsky v. Ackley,* 169 A.D.2d 254, 572 N.Y.S.2d 672, 677 (1991)). In *Banque Arabe,* the court determined that the party could not reasonably rely on the other party to disclose the allegedly fraudulently concealed information because the information generally was readily accessible to anyone who inquired and the risk associated with this information was known and disclosed. *Banque Arabe,*

57 F.3d at 156–57. Here, in contrast, Allegheny has alleged that the information at issue was not generally known nor readily accessible because it pertained to potentially illegal activity that Merrill Lynch would not want to disclose. In particular, Allegheny alleges, and it seems plausible to me, that if true Merrill Lynch would not have provided access to information about the sham energy trades with Enron because these were part of a fraudulent scheme to inflate Enron's revenues. Similarly, Merrill Lynch would not have provided information about the Falcon Energy transaction and Merrill Lynch's concern that Gordon stole $43 million. To the extent that Allegheny has alleged that this information was peculiarly within Merrill Lynch's knowledge, allegations that must be accepted as true for present purposes, the line of cases that hold that sophisticated parties that have access to information and are on notice of their importance in the transaction cannot justifiably rely if they fail to take advantage of this access or to include a representation in the final agreement are inapposite. To be sure, the fact that Allegheny agreed in the Confidentiality Agreement that Merrill Lynch was making no representation about the accuracy or completeness of the "Evaluation Material," which indisputably encompassed the alleged misrepresentations made by Merrill Lynch during the various presentations in September 2000, casts doubt on the reasonableness of Allegheny's reliance. However, to the extent that there is tension between this disclaimer and Merrill Lynch's representations in the Purchase Agreement that it provided in good faith information appropriate to evaluate the transaction, the representation in the Purchase Agreement should control.

### C. Counterclaim for rescission

Merrill Lynch contends that the counterclaim for rescission should be dismissed

because Allegheny accepted the benefits of the Purchase Agreement and so it is not possible to restore the then-existing status quo. Allegheny does not defend its claim for rescission, but notes in a footnote that it has contracted to terminate a tolling agreement it acquired from Merrill Lynch—thus making rescission even less appropriate—and will withdraw the rescission claim when that transaction has terminated. Merrill Lynch contends that the rescission claim should be dismissed forthwith and I agree.

**D. Counterclaim for breach of contract**

Allegheny Energy alleges that by failing to disclose the sham trades with Enron (and perhaps others) and the problems with Gordon, Merrill Lynch breached three of the representations and warranties it made in the Purchase Agreement.

**1. Section 3.05**

■ Section 3.05 of the Purchase Agreement provides "Except as set forth in Section 3.05 of the Sellers' Disclosure Schedule, the Sellers are conducting the Business in compliance in all material respects with all applicable Laws, and all material governmental approvals, permits and licenses ... required for the Sellers to conduct the Business as currently conducted have been obtained." Allegheny alleges that Merrill Lynch breached this representation because, in fact, it was engaging in sham trades with Enron and possibly others. Merrill Lynch contends that this representation should only encompass activities as of the date of the sale, given the tense of the verb and the fact that while other representations encompass historical activities, this one does not. Merrill Lynch also contends that its interpretation is bolstered by the fact that this was an asset sale. It is not necessary to resolve at this point the meaning of "are conducting" because Merrill Lynch's argument focuses solely on the Enron trades, which were cancelled before the subject of the deal was even broached, and ignores that Allegheny also alleged that Merrill Lynch made other sham trades and that these trades may have implicated section 3.05. Thus, Allegheny has sufficiently pled a breach of section 3.05 of the Purchase Agreement.

**2. Section 3.12**

In Section 3.12 of the Purchase Agreement, Merrill Lynch represented that "The Business Selected Data has been prepared in good faith by the management of the Business based upon the financial records of the Business .... [and][t]he books of account and other financial records of the Business (i) are in all material respects true, complete and correct, and do not contain or reflect any material inaccuracies or discrepancies and (ii) have been maintained in accordance with ML & Co.'s business and accounting principles." Again, Allegheny alleges that Merrill Lynch breached this representation by misrepresenting and/or concealing the sham trades with Enron and possibly others, which consequently inflated GEM's revenues. Merrill Lynch contends that it has not breached this representation because the fee that it earned on the trades with Enron were accurately and properly reported—and that this is all that this representation covered. Allegheny has stated a claim for breach of this representation and warranty. Even if it is true that Merrill Lynch's inclusion of the $8.5 million fee for the Enron transaction satisfied the requirement that its books were "in all material respects true, complete and correct," Allegheny's allegations also touch on the first part of this representation, namely that the "Business Selected Data has been prepared in good faith."

**3. Section 3.16**

■ In Section 3.16, Merrill Lynch represented that "The information provided

by Sellers to Purchasers, in the aggregate, includes all information known to Sellers which, in their reasonable judgment exercised in good faith, is appropriate for Purchasers to evaluate the trading positions and trading operations of the Business." Allegheny alleges that Merrill Lynch breached this representation by misrepresenting and/or concealing the sham trades with Enron and others as well as misrepresenting and/or concealing information about Gordon, in particular the potentially illegal trade he orchestrated with Falcon Energy. Merrill Lynch again contends that the Enron trades were not part of GEM's "trading positions and trading operations" when the Purchase Agreement became effective in early 2001. Merrill Lynch also contends that Section 3.16 is not a representation about GEM's historical transactions. With respect to Gordon and his purportedly illegal trade with Falcon Energy, Merrill Lynch contends that pursuant to Section 9.01 of the Purchase Agreement, Allegheny was obligated to give notice of any claims under that section by September 25, 2002;[8] although Allegheny provided this notice on the deadline, it did not specify the Falcon Energy trade with sufficient specificity to preserve it.

Allegheny's allegations here are sufficient to survive this motion to dismiss. First, it is difficult to see how the information about the sham Enron trades, even if they were cancelled before the Purchase Agreement, would not be appropriate in order for Allegheny to evaluate GEM's trading positions and trading operations.

With respect to Merrill Lynch's contention about the lack of sufficient specificity in the notice to preserve the allegations about Falcon Energy, the two cases that Merrill Lynch relies on are inapposite. Section 9.01 requires no specificity in the notice of any claim, while the "survival" clauses in the cases relied on by Merrill Lynch did require specificity in the notice. See *Rutgerswerke AG v. Abex Corp.*, No. 93 Civ. 2914, 2002 WL 1203836, **6–7, 2002 U.S. Dist. LEXIS 9965, at *23–*24 (S.D.N.Y. June 4, 2002) (the survival clause provided that "any claim for an alleged breach of a representation or warranty which is not asserted by written notice given as herein provided *which describes the basis for such claim with specificity* may not be pursued" (emphasis added)); *Carmeuse v. M.J. Stavola Indus., Inc.*, 823 F.Supp. 125, 131 (S.D.N.Y.1993) (requiring that the party "specify[ ] the nature and amount of such claims").[9]

### E. Counterclaim for breach of fiduciary duty

■ Merrill Lynch contends that Allegheny's counterclaim for breach of fiduciary duty should be dismissed because the parties' prior fiduciary relationship ended before they negotiated for the sale of GEM and thus there was no longer any fiduciary duty for it to breach when it made the representations about GEM. Allegheny on the other hand contends that its claim for breach of fiduciary duty is premised on the notion that Merrill Lynch decided to sell GEM to Allegheny Energy while there was a fiduciary relationship and without

---

**8.** Section 9.01 provides that, with certain exceptions not relevant to this provision, "the representations and warranties ... contained in this Agreement ... shall survive the Closing until 18 months following the Closing Dates.... If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by a party hereto to the other party, then the rele-

vant representations and warranties as to such claim shall survive, until such claim has been finally resolved."

**9.** In addition, Merrill Lynch contends that it did not know about the Falcon Energy trade until 2002, but this conflicts with Allegheny Energy's allegations, which control at this stage of the litigation.

disclosing the information about the sham trades or the concerns about Gordon. I conclude that Allegheny has alleged enough to survive this part of Merrill Lynch's motion to dismiss.

Merrill Lynch cites a number of cases that generally stand for uncontroverted propositions of law—for example, that there can be no breach of a fiduciary duty unless a fiduciary relationship exists. While it is clear that the negotiations for the sale occurred after this relationship terminated and the parties began to deal at arms' length and Allegheny retained other advisors, it is also uncontroverted that a fiduciary relationship existed for some period prior to the sale and during which the sale was first mentioned. Accordingly, at the time Merrill Lynch mentioned to Allegheny the prospect of selling GEM, it was under a fiduciary duty, and it is improper at this stage to determine that its disclosures—or lack thereof—at that point breached its duty to Allegheny. *Cf. Morris v. Crawford,* 304 A.D.2d 1018, 757 N.Y.S.2d 383, 386 (2003) ("[W]hile the pre-termination surreptitious solicitation of firm clients for a partner's personal gain indeed would be contrary to the partner's fiduciary duty, the record before us completely fails to support any finding that defendant attempted to solicit Morris Associates' clients prior to May 15, 1992.") (citation omitted).

### F. Punitive damages

■ Merrill Lynch seeks to strike Allegheny's claim for punitive damages on the grounds that under New York law punitive damages are available for egregious tortious conduct directed at the public generally, not for conduct affecting a private transaction. Allegheny contends (in a footnote) that this is the rule for breach-of-contract claims and that for fraudulent inducement or breach of fiduciary duty all that need be shown is intentional or deliberate wrong doing.

■ Notwithstanding Allegheny's contention to the contrary, it is clear that its claim for punitive damages fails if it must demonstrate that Merrill Lynch's conduct was directed at and harmed the public generally. Allegheny asserts that "the collapse of Enron, which Merrill [Lynch] assisted in, undeniably caused a public harm insofar as it is [sic] harmed public confidence in energy markets." While there is little doubt that the collapse of Enron harmed the public and Merrill Lynch played some role in this sorry story, Allegheny's counterclaims against Merrill Lynch relate to the companies' private dealings, not to any conduct by Merrill Lynch aimed at the public. Stated another way, although Allegheny alleges that Merrill Lynch booked sham energy trades with Enron, the conduct for which Allegheny here seeks redress is not Merrill Lynch's role in assisting Enron deceive and harm the public, but rather Merrill Lynch's alleged deception of Allegheny. Thus, the availability of punitive damages depends on whether or not New York law requires Allegheny to show a public harm in these circumstances.[10]

10. Merrill Lynch's argument on this issue centers on the public-harm requirement for punitive damages. Merrill Lynch does not suggest that Allegheny's allegations about Merrill Lynch fail to rise to the level of conduct for which punitive damages are appropriate. "Punitive damages are available only in those limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations.' " *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 315–16, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (quoting *Rocanova,* 83 N.Y.2d at 614, 612 N.Y.S.2d 339, 634 N.E.2d 940, which in turn quoted *Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961)); *see also Don Buchwald & Assocs. v. Rich,* 281 A.D.2d 329, 723 N.Y.S.2d 8,

 According to the New York Court of Appeals,

> Punitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights. However, where the breach of contract also involves a fraud evincing a "high degree of moral turpitude" and demonstrating "such wanton dishonesty as to imply a criminal indifference to civil obligations", punitive damages are recoverable if the conduct was "aimed at the public generally".... Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.

*Rocanova v. Equitable Life Assurance Soc'y of the United States,* 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994). Allegheny contends that the public-harm component is not required for its fraud and breach-of-fiduciary claims. It appears there is some uncertainty about when punitive damages are available if a claim for fraud or breach of fiduciary duty is related to a claim for breach of contract. *See Schonfeld v. Hilliard,* 218 F.3d 164, 183–84 (2d Cir.2000) ("The Court of Appeals has since suggested that these requirements [including a public harm] are applicable whenever an action 'has its genesis in the contractual relationship between the parties.'" (quoting *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)));[11] *TVT Records v. Island Def Jam Music Group,* 262 F.Supp.2d 188, 193–94 (S.D.N.Y.2003).[12] In *New York Universi-*

9 (2001) ("To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another."). If Merrill Lynch sold a business that it knew was in significantly different condition than it represented and failed to disclose certain facts when it had a duty to do so, such conduct might be said to be gross or morally reprehensible.

**11.** The Second Circuit in *Schonfeld* did not resolve the issue because it found an alternative reason to dismiss the claim for punitive damages. *See Schonfeld,* 218 F.3d at 184 ("We need not decide whether the 'public harm' requirement set forth in *Rocanova* applies to claims for fraud or breach of fiduciary duty, however, because we agree with the district court that the defendants' alleged conduct was not 'sufficiently egregious' or 'willful' to warrant the imposition of exemplary damages even under the standards applicable to ordinary fraud claims."). The court there noted that the party arguing that the public harm requirement is not applicable to claims for fraud or breach of fiduciary duty relied on pre-*Rocanova* cases. *See id.*

**12.** In *TVT Records,* Judge Marrero noted that there were "uncertainties, confusion and con-

tradiction" with respect to whether punitive damages for breach of contract in New York law requires a "public aim" element. *See TVT Records,* 262 F.Supp.2d at 194. He noted that "[s]ome cases indicate that conduct directed at the public in general is required[, while o]thers suggest that the standard applies in the alternative to extraordinarily culpable behavior." *Id.* He also included an appendix in which he categorized cases into three categories with respect to what is required to obtain punitive damages in a claim for a breach of contract: 1) a high degree of moral culpability *and* conduct directed at the public, 2) conduct directed at the public *or* a particularly high degree of moral culpability, and 3) no such "public-aim" requirement or no mention of it. *See id.* at 199–204. Judge Marrero concluded that the cases established a "general requirement that some form of public rights be implicated in a defendant's wrongs" but that there was a narrow exception:

> [A]bsent conduct directed at the public in general, punitive damages may be available in a breach of contract claim where the plaintiff establishes a sufficiently high degree of bad faith by the defendant evincing disingenuous or dishonest failure to carry out contractual obligations, thus frustrating the plaintiff's rights to an aggravated extent, particularly where bad faith is appar-

*ty,* the Court of Appeals recounted the elements from *Rocanova* required for punitive damages when the claim arises from a breach of contract, the first of which is that "defendant's conduct must be actionable as an independent tort."[13] *New York Univ.,* 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763. With respect to this element, the Court further stated: "Where a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract." *Id.* Probing further, the Court then noted, "Where a party has fraudulently induced the plaintiff to enter into a contract, it may be liable in tort." *Id.* Thus, Allegheny's claims for fraudulent inducement fits squarely within the rubric stated in *Rocanova* and reiterated in *New York University* for a "claim [that] arises from a breach of contract," in which there must be a showing of a public harm. Accordingly, to the extent that Allegheny has failed to establish that Merrill Lynch's conduct was directed at the public, punitive damages are not available for its fraudulent-inducement claim.

■ On the other hand, a different result is appropriate for Allegheny's claim for fiduciary duty. Although clearly related, Allegheny's claim for breach of fiduciary duty does not "arise from a breach of contract" or "ha[ve] its genesis in the contractual relationship between the parties."

*New York Univ.,* 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763. Rather, Allegheny's claim for breach of a fiduciary duty arises from a relationship that pre-existed the contractual relationship and pertains to different, albeit related, conduct than that which forms its breach-of-contract claim. *Cf. Zuccarini v. Ziff–Davis Media, Inc.,* 306 A.D.2d 404, 762 N.Y.S.2d 621, 623 (2003) ("The allegations of fraud are sufficiently collateral to the alleged agreement to support a claim of fraud in the inducement.").

It may be that once all the facts are fleshed out there is no sustainable claim for punitive damages. For now the wrongful conduct of Merrill Lynch coupled with its alleged breach of fiduciary duty and its public persona leads me to deny this branch of the motion. Indeed, as I reflect on the motion overall, I am somewhat troubled as to why much of it was ever initiated.

**G. Jury demand**

■ Section 11.09(b) of the Purchase Agreement provides that "the parties hereto irrevocably waive any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or any of the transactions contemplated hereby." Despite this provision, Allegheny contends that it is entitled to a jury trial on its claim of fraudulent inducement. Merrill Lynch contends that the law is clear in this Circuit that the jury waiver applies to a claim for fraudulent

---

ent at or near the outset of the transaction and where the breached obligations are unambiguous. *Id.* at 196. While this rule has some appeal, most of the cases decided after *Rocanova* and *New York University* require both a high degree of moral culpability *and* conduct directed at the public, while most of the cases that do not require the "public-aim" element were decided before those cases. *See id.* at 199–204.

**13.** The other elements as stated in *New York University* are "(2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon;* (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally." *New York Univ.,* 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763.

inducement, especially where, as here, there is no allegation that the waiver provision itself was procured through fraud. Although the law in this Circuit is not entirely clear, it generally favors Merrill Lynch's position, *see Russell–Stanley Holdings, Inc. v. Buonanno,* 327 F.Supp.2d 252, 257–58 (S.D.N.Y.2002), and the waiver will survive.

## III. CONCLUSION

For the foregoing reasons, counterclaim defendants' motion is granted in part and denied in part.

**IT IS SO ORDERED.**