MERRILL LYNCH & CO., INC., Merrill Lynch Capital Services Inc., and ML IBK Positions, Inc., Plaintiffs,

v.

ALLEGHENY ENERGY, INC., Defendant,

Allegheny Energy, Inc., and Allegheny Energy Supply Co., LLC., Counterclaim–Plaintiffs,

v.

Merrill Lynch & Co., Inc., and Merrill Lynch Capital Services, Inc., Counterclaim–Defendants.

No. 02 Civ. 7689(HB).

United States District Court, S.D. New York.

Oct. 26, 2004.

John Gueli, Shearman & Sterling, L.L.P., New York City, Stuart Jay Baskin, Shearman & Sterling L.L.P., New York City, for plaintiffs.

Alan Ross Arkin, Arkin, Kaplan, LLP, New York City, Daniel E. Morrison, Sachnoff & Weaver, Chicago, IL, David C. Bohan, Sachnoff & Weaver, Chicago, IL, Hyman L. Schaffer, Arkin, Schaffer & Kaplan L.L.P., New York City, Jonathan S. Polish, Sachnoff & Weaver, Chicago, IL, for defendant.

## *MEMORANDUM & ORDER*

BAER, District Judge.

Present before the Court are two outstanding issues. First, counterclaim plaintiffs Allegheny Energy, Inc.[1] and Allegheny Energy Supply Co., LLC (collectively, "Allegheny") move pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 15(a) for leave to file Second Amended Counterclaims in the above-captioned matter. Second, Allegheny seeks discovery of two reports produced in connection with an internal investigation conducted by counterclaim defendants Merrill Lynch & Co., Inc. and Merrill Lynch Capital Services, Inc.[2] (collectively, "Merrill Lynch"). For the reasons discussed herein, Allegheny's motion for leave to amend is granted in part and denied in part and its request for production of the two reports is denied. For the purposes of the following discussion, familiarity with the facts of this case as set out in the Court's November 24, 2003 Opinion and Order, *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 382 F.Supp.2d 411, 2003 WL 22795650 (S.D.N.Y. Nov.25, 2003),[3] is presumed.

### I. Motion for Leave to Amend

 Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires." Under this standard

---

1. Allegheny Energy, Inc. is also a defendant in this action.

2. These two Merrill Lynch entities, together with ML IBK Positions, Inc., are the original plaintiffs.

3. Although the Westlaw version of this decision is dated November 25, 2003, the Slip Opinion was signed on November 24, 2003.

the decision to grant leave to amend is within the sound discretion of the Court. *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir.1998). Leave should not be granted, however, if it would prejudice the opposing party, *id.*, or where the proposed amendment would be futile, *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 655 F.Supp. 710, 711 (S.D.N.Y.1987) (finding that "it is inappropriate to grant leave when the amendment would not survive a motion to dismiss"). Merrill Lynch does not claim it would be prejudiced by the proposed amendments or that it would be futile to amend. Indeed, Merrill Lynch only opposes Allegheny's motion to the extent that Allegheny seeks punitive damages and demands a jury trial in its proposed Second Amended Counterclaims. Where, as here, a party seeks to amend pleadings after the deadline set by the Court's scheduling order,[4] the Second Circuit has held that the stricter "good cause" standard applies. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir.2000). "Good cause" requires diligence, *id.*, which Allegheny has shown, as it moved for leave to amend within three weeks of its receipt of documents produced during discovery, which, in part, formed the basis of its motion.[5] Allegheny therefore has met both of these standards and, accordingly, will be allowed to amend its counterclaims. Unfortunately, this does not end the inquiry.

■ Allegheny's proposed amendments conflict with the Court's November 24, 2003 Opinion and Order in two important regards. First, Allegheny's proposed Second Amended Counterclaims seek punitive damages for Allegheny's first counterclaim for fraud. I previously decided that punitive damages were not available for Allegheny's fraudulent inducement claim. *Merrill Lynch & Co., Inc.*, 382 F.Supp.2d at 421, 2003 WL 22795650 at *8. As I earlier explained, this claim arises from Allegheny's breach of contract claim,

which requires Allegheny to establish that Merrill Lynch's conduct was directed at and worked a harm to the public in general. *Id.* at 421–22, 2003 WL 22795650 at *8–9. As Merrill Lynch points out, Allegheny did not move for reconsideration, and it is far too late for it to do so now. In any event, Allegheny has not presented additional allegations of the requisite public harm. It may be that Daniel Gordon's ("Gordon") plea allocution has implied a more far-reaching fraud, Letter from Stanley Arkin to the Court of 7/12/04 ("Arkin Letter"), Ex. A at 27:23–28–:1 (describing a decision by Gordon's "superiors" to alter financial data to make the Energy Trading Division look more profitable to potential buyers). This does not alter the harm alleged. As I have already noted, "the conduct for which Allegheny here seeks redress is not Merrill Lynch's role in assisting Enron [to] deceive and harm the public, but rather Merrill Lynch's alleged deception of Allegheny." *Id.* at 421, 2003 WL 22795650 at *8. Therefore, Allegheny's motion is denied to the extent that it seeks punitive damages on its fraud counterclaim.

■ Second, Allegheny's proposed Second Amended Counterclaims are at odds with my earlier decision in this matter to the extent that they make a jury demand. The plain language of Section 11.09(b) of the Asset Contribution and Purchase Agreement[6] provides that "[t]he parties hereto hereby irrevocably waive any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or any of the transaction contemplated hereby." *Id.* at 423, 2003 WL 22795650 at *10. All of Allegheny's counterclaims either "arise out of" or are "related to" the agreement between the parties and I have already decided that the balance of the case law favors enforcement of this mutually agreed-upon and bargained for contractual term. There is nothing further

---

4. The last date for amended pleadings in the June 23, 2003 pre-trial scheduling order—agreed to and signed off by the parties—was August 29, 2003.

5. Allegheny also bases its motion on Daniel Gordon's guilty plea, which was entered and accepted by Judge Lynch on December 19, 2003. *United States v. Gordon*, No. 03 Cr. 1494.

6. The Asset Contribution and Purchase Agreement was the January 8, 2001 agreement between Allegheny and Merrill Lynch for the purchase of the Merrill Lynch's energy commodity trading business, Global Energy Markets for $490 million in cash and a 2% equity interest in Allegheny Supply. *Merrill Lynch & Co., Inc.*, 382 F.Supp.2d at 414–15, 2003 WL 22795650, at *2.

to address and therefore Allegheny's motion is denied in this respect as well.

## II. Discovery of Reports

### A. Factual Background

Allegheny also seeks production of two reports, which are the results of Merrill Lynch's internal investigation into the circumstances surrounding Gordon's theft of some $43 million in connection with the Falcon Energy Trade.[7] In the Fall of 2002, shortly after this lawsuit was filed, the United States Attorney's Office for the Southern District of New York informed Merrill Lynch that it was investigating the Falcon Energy Trade. Merrill Lynch therefore undertook its own internal investigation (conducted by and under the supervision of in-house and outside counsel), which culminated in two reports: (1) the March 5, 2003 Report to James Mann, Office of the General Counsel of Merrill Lynch; and (2) the June 25, 2003 Special Review of Transaction Approval and Processing Controls.

In August 2003, there was widespread publicity concerning Gordon's theft in connection with the Falcon Energy Trade. As a result, Andrew McMaster ("McMaster"), the lead client services partner for Deloitte & Touche, Merrill Lynch's independent auditor, spoke with John McDermott ("McDermott"), the Director of Corporate Audit at Merrill Lynch, who works out of Merrill Lynch's Office of General Counsel, and inquired about Gordon's theft and Merrill Lynch's subsequent actions. McDermott informed McMaster that Merrill Lynch's counsel and corporate auditor had investigated the theft and produced the two reports at issue here, under the direction and supervision of counsel. McMaster requested and was provided with a copy of these reports. Both McMaster and McDermott attested that these reports were provided to assist McMaster to "identif[y] any potential internal control, accounting or audit issues of which [he] was not already aware based on [his] routine and regular prior discussions with Merrill Lynch

during the course of the audit. . . ." Letter from John Gueli to the Court of 9/28/04 ("Gueli Letter"), Ex. B. ¶ 5; *see also id.,* Ex. A ¶ 4. Further, both McMaster and McDermott declared that these reports were provided with the understanding that (1) they were prepared by counsel and were privileged; (2) Deloitte & Touche would keep these materials confidential; and (3) there would be no further disclosure. *Id.,* Ex. A ¶¶ 4–6; Ex. B ¶¶ 5–7. According to McMaster, he read the reports and concluded that they presented no new issues and did not impact Deloitte & Touche's audit work or Merrill Lynch's financial statements. Ultimately, Deloitte & Touche issued an unqualified audit report with regard to Merrill Lynch's 2003 financial statements.

Allegheny now seeks to obtain both of these reports and argues that this disclosure to Deloitte & Touche constituted a waiver of any applicable privileges. Merrill Lynch apparently concedes that the attorney-client privilege has been waived and argues that the reports instead fall under the work product privilege. Merrill Lynch acknowledges that Deloitte & Touche's audit work and discussions with Merrill Lynch personnel regarding internal control and other issues are discoverable. However, Merrill Lynch argues that these two reports contain substantially more information, including the details of "Merrill Lynch's counsel's investigation, mental impressions, conclusions, and opinions regarding Gordon's theft. . . ." Gueli Letter at 4 n. 2. Merrill Lynch seeks to shield these intimate details from disclosure.

### B. The Work Product Privilege

■ The work product privilege, as articulated by the Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) and later codified by Fed.R.Civ.P. 26(b)(3), provides that materials prepared in anticipation of litigation are not discoverable absent a showing that the party seeking discovery has a substantial need for the materials and cannot obtain the equivalent without

---

**7.** At his plea allocution, Gordon admitted that he created a fictitious entity called Falcon, which he presented to his colleagues as a company that would hedge the risk of other long-term energy

transactions, including those of the Global Energy Markets purchased by Allegheny. Arkin Letter, Ex. A at 26:24–27:16. The parties disagree as to whether or not Gordon acted alone.

undue hardship. This doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (citing *Hickman*, 329 U.S. at 510–11, 67 S.Ct. 385). The policy underlying work product protection is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir.1980). As counsel for Allegheny observed not too long ago,

> [t]he American legal system takes as its axioms the importance of effective counsel, the need for a client to be able to confide in his or her (or, since Upjohn,[8] its) attorney, and the advantages of zealous representation in an adversarial system. The attorney-client and work-product privileges were instituted to serve those important social ends, even at the cost of occasionally limiting the truth-seeking function in individual cases.

Stanley S. Arkin and Charles Sullivan Attacking, *Business Crime: Corporate Attorney–Client Privilege and Work Product*, N.Y.L.J., May 5, 2004, at 3, (col.1). Thus, when weighing two fundamental components of our legal system—the liberal rules of discovery outlined by the Federal Rules of Civil Procedure, *e.g.*, *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir.2003) ("Discovery rules 'are to be accorded a broad and liberal treatment [ ] to effectuate their purpose that civil trials in the federal courts no longer need be carried on in the dark.'") (alteration in original) (quoting *Schlagenhauf v. Holder*, 379 U.S. 104, 115, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964)), and the "adversary system's interest in maintaining the privacy of an attorney's thought processes and in ensuring that each side relies on its own wit in preparing their respective cases," *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir.1985)—the balance must sometimes tip towards a limitation on the free-flow of information so that a

higher purpose is served. This is entirely consistent with a variety of other doctrines within our legal system, including the exclusionary rule, the prohibition against hearsay, and the application of evidentiary privileges. As the Supreme Court has observed, "[t]here is no gainsaying that arriving at the truth is a fundamental goal of our legal system. But various constitutional rules limit the means by which government may conduct this search for truth in order to promote other values embraced by the Framers and cherished throughout our Nation's history." *James v. Illinois*, 493 U.S. 307, 311, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) (internal quotation marks and citation omitted) (discussing the exclusionary rule).

The parties here do not contest the applicability of the work product privilege to the two reports. Indeed, it is evident that the reports were at least initially protected by the privilege as they were the results of an internal investigation conducted under the guidance of counsel after Merrill Lynch was informed that it was the subject of a criminal investigation. Under these circumstances, it is safe to say that the reports were prepared in anticipation of litigation. *See In re LTV Sec. Litig.*, 89 F.R.D. 595, 612 (N.D.Tex.1981) ("Investigation by a federal agency presents more than a 'remote prospect' of future litigation and gives grounds for anticipating litigation sufficient for the work-product rule to apply."). Instead, the debate here centers on whether Merrill Lynch waived the applicable privilege when it provided the reports to Deloitte & Touche.

### C. Waiver

■ Generally speaking, "[t]he work product privilege should not be deemed waived unless disclosure is inconsistent with maintaining secrecy from possible adversaries." *Stix Prods. v. United Merchants & Mfrs.*, 47 F.R.D. 334, 338 (S.D.N.Y.1969). "The work product privilege is not automatically waived by any disclosure to third persons. Rather, the courts generally find a waiver of the work product privilege only if the disclosure 'substantially increases the opportunity for potential adversaries to obtain the informa-

---

**8.** *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

tion.'" *In re Pfizer Inc. Sec. Litig.*, No. 90 Civ. 1260, 1993 WL 561125, at *6 (S.D.N.Y. Dec.23, 1993) (quoting *In re Grand Jury*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)) (internal citation omitted). Implicit in this analysis is the question of whether the third party itself can or should be considered an adversary. Accordingly, courts have generally held that where the disclosing party and the third party share a common interest, there is no waiver of the work product privilege. *E.g., id.* ("Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine."); *see also In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 221 n. 6 (S.D.N.Y.2001) (same).

■ This much is settled. However, courts are split in their treatment of disclosures to a corporation's accountants or auditors. More precisely, courts differ in their conceptualization of two critical points that are often implicitly intertwined in their analysis: whether the "adversary" contemplated by the work product privilege is necessarily a litigation adversary and whether a corporation's auditor is such an adversary, to whom disclosure will waive the privilege. While admittedly there are good arguments on both sides, in this case, I answer both questions in the negative and conclude that Merrill Lynch's disclosure of the reports to Deloitte & Touche did not constitute a waiver of the applicable work product protection.

In a frequently cited case, *In re Pfizer, Inc. Sec. Litig.*, Judge Buchwald held that Pfizer's disclosure of documents to its independent auditor, KPMG Peat Marwick ("Peat Marwick"), did not waive its work product privilege. 1993 WL 561125, at *6. Judge Buchwald's decision was based on her observation that "Pfizer and Peat Marwick obviously shared common interests in the information, and Peat Marwick is not reasonably viewed as a conduit to a potential adversary." *Id.* Other courts have adopted precisely this analysis. *E.g., Gutter v. E.I. Dupont de Nemours & Co.*, No. 95 Civ. 2152, 1998 WL 2017926, at *5 (S.D.Fla. May 18, 1998) (holding that disclosure to outside accountants did not waive the work product privilege "since the accountants are not con-

sidered a conduit to a potential adversary"); *Gramm v. Horsehead Indus., Inc.*, No. 87 Civ. 5122, 1990 WL 142404, at *5 (S.D.N.Y. Jan.25, 1990) (same). Still others have applied this approach, but scrutinized the precise role of the accountants. *E.g., Samuels v. Mitchell*, 155 F.R.D. 195, 201 (N.D.Cal. 1994) (deciding that disclosure did not constitute a waiver of the work product privilege because the accounting firm was acting as a consultant, not a "public accountant," at the relevant time).

Judge Hellerstein articulated another view in *Medinol, Ltd. v. Boston Scientific Corp.*, where, in finding a waiver of the work product privilege, he emphasized the "public watchdog" role of independent auditors. 214 F.R.D. 113, 116 (S.D.N.Y.2002) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)). Judge Hellerstein observed that it "has become crystal clear in the face of the many accounting scandals that have arisen as of late, in order for auditors to properly do their job, they *must* not share common interests with the company they audit." *Id.* at 116 (emphasis in original). While this is a valid policy consideration, the fact is that the determination in *Medinol* was based on a finding that the auditor's interests were not aligned with that of the corporation and that the disclosure of the documents at issue—the Special Litigation Committee's minutes—did not serve a pertinent litigation interest.

These cases turn on their facts. In *Mass. Inst. of Tech.*, for example, the First Circuit noted that the Massachusetts Institute of Technology ("MIT") had a common interest with the Department of Defense's ("DOD") audit agency in "the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills." 129 F.3d at 686. However, the First Circuit found that the audit agency—which was responsible for preventing an overcharge for services—was a potential adversary because a review of MIT's billing statements could result in a dispute or even litigation. *Id.* at 683, 687. Thus, MIT was found to have forfeited its work product protection, but only after an analysis of the parties' relationship. Similarly, in *In re Raytheon Sec. Li-*

*tig.*, the court recognized that "[t]he pivotal question is whether disclosure of documents protected by the work product doctrine to an independent auditor substantially increases the opportunities for potential adversaries to obtain the information." 218 F.R.D. 354, 360 (D.Mass.2003). After a discussion of the public responsibilities of independent auditors, the court noted that "there is no evidence that materials disclosed to an independent auditor are likely to be turned over·to the company's adversaries except to the extent that the securities laws and/or accounting standards mandate public disclosure." *Id.*

As these cases make clear, the Court's inquiry must not end with the mere fact of a disclosure to the independent auditors. Indeed, in an analogous context, the Second Circuit has specifically eschewed a *per se* rule of waiver. *In re Steinhardt Partners*, 9 F.3d 230, 236 (2d Cir.) ("we decline to adopt a *per se* rule that all voluntary disclosures to the government waive work product protection"). Instead, the Court must assess of what type of common interests the work product doctrine contemplates and whether a corporation and its outside auditors share any such interest.

Courts in this District have ruled that it not necessary that the party to whom disclosure made share a "litigation" interest with the party that asserts the privilege. *Cellco P'ship d/b/a Verizon Wireless v. Nextel Communication, Inc.*, No. M8–85, Civ.A. 03–725, 2004 WL 1542259, at *1 (S.D.N.Y. July 9, 2004) (deciding that defendant and its advertising agency shared a common business interest and therefore disclosure of an e-mail with legal advice did not waive work product privilege); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. at 221 n. 6 (holding that there was no waiver of the work product protection because the business and public relations firm specializing in "litigation-relat-

ed crisis management" shared a common interest). Thus, the fact that Merrill Lynch and Deloitte & Touche do not share a common litigation interest is of no moment.[9]

Instead, the critical inquiry—to me—must be whether Deloitte & Touche should be conceived of as an adversary or a conduit to a potential adversary. As Judge Hellerstein and other courts have observed, an independent auditor could be conceived of as an adversary because of its important public function to independently ensure the accuracy of a company's financial reports. Clearly, outside auditors must maintain an independent role in this regard. Indeed, a good portion of the reforms embodied in the Sarbanes–Oxley Act of 2002 ("Sarbanes Oxley"), 17 U.S.C. § 7201 *et seq.*, are aimed at strengthening the independence of auditors and eliminating conflicts of interest. *See, e.g.*, John C. Coffee, Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 B.U. L.Rev. 301, 335, 336 (April 2004). I concur with the need for auditors to retain their independence. I conclude, however, that a waiver is not supported by the circumstances of this case or applicable case law and that such a holding will not impair auditor independence.

As I read them, the work product cases require a tangible adversarial relationship. The First Circuit, for example, found that the DOD's audit agency was an adversary because it could potentially dispute a billing charge and file suit against MIT, not because of its duty to review MIT's accounts. *Mass. Inst. of Tech.*, 129 F.3d at 687. This requirement makes particular sense when one considers the importance of the work product doctrine in safeguarding our adversary system of litigation. *Hickman*, 329 U.S. at 511, 67 S.Ct. 385 (reasoning that without work product protection "[a]n attorney's thoughts, heretofore inviolate, would not be his own.

---

9. This view of "common interests" may very well stem from this Circuit's approach to work product protection in general. Our Circuit has adopted the more expansive "because of" test for work product, under which any document prepared " 'because of' existing or expected litigation" is sheltered under the protection of the work product privilege. *Adlman*, 134 F.3d at 1198 (rejecting the narrower formulation that

encompasses only those documents "prepared 'primarily or exclusively to assist in litigation' "). Under this formulation, work product protection extends to documents prepared in anticipation of litigation even if they are "intended to assist in the making of a business decision influenced by the likely outcome of the anticipated litigation." *Id.* at 1195.

Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served."). Further counseling for a more concrete approach is the Supreme Court's observation that the work product "doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system." *Nobles,* 422 U.S. at 238, 95 S.Ct. 2160.

Thus, any tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine. Nor should it be. A business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud. Indeed, this is precisely the type of limited alliance that courts should encourage. For example, here Merrill Lynch complied with Deloitte & Touche's request for copies of the internal investigation reports so that the auditors could further assess Merrill Lynch's internal controls, both to inform its audit work and to notify the corporation if there was a deficiency. An internal control, as defined by the professional standards of the American Institute of Certified Public Accountants ("AICPA"), "is a process—effected by an entity's board of directors, management, and other personnel—designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AICPA AU § 319.06 (2001). As this definition indicates, information regarding internal controls directly relates to the reliability of financial information and legality of corporate behavior.[10] Without access to this information, auditors would likely fail in the fulfillment of their important public function. Consistent with this, Deloitte & Touche requested Merrill Lynch's investigative reports in August 2003 so that it could determine whether Gordon's theft and the surrounding circumstances impacted upon Merrill Lynch's financial statements, and, if necessary, report any conditions that could adversely affect the corporation's ability to record or report financial data to directors and officers, *e.g.,* AICPA Statement on Auditing Standards ("SAS") 60.02—both of which ultimately lead to the dissemination of more accurate information to the investing public.

There was no further disclosure of the protected material in this case, nor could there have been, as Deloitte & Touche was under an ethical and professional obligation to maintain materials received from its client confidential, unless disclosure was required by law or accounting standards. Gueli Letter, Ex. B ¶ 7. The relevant standards at the time in question did not contemplate disclosure of documents or their specific contents to a third party. Instead, if an auditor learned of a "reportable condition," i.e., an internal control deficiency that "could adversely affect the organization's ability to record, process, summarize, and report financial data," AICPA SAS 60.02, the auditor was obligated to report this information to corporate management, the audit committee, and/or the board of directors, AICPA SAS 60.02, .09, .10, AICPA SAS 61. The applicable standard specifically provides that an auditor's report on a reportable condition should state that it is to be used only by personnel within the corporation, unless the auditor is required to furnish the report to government authorities. AICPA SAS 60.10. The only public revelation could have been, in the worst case scenario, a general statement by Deloitte & Touche regarding its inability to accurately evaluate Merrill Lynch's financial statements due to internal

---

**10.** At the time of the disclosure in this case, auditors were not required to report separately on a corporation's internal controls. *Compare* AICPA AU § 319.05 ("The auditor uses the understanding of internal control and the assessed level of control risk in determining the nature, timing, and extent of substantive tests for financial statement assertions.") *with* Sarbanes–Oxley § 404, 15 U.S.C. § 7262 (requiring management to report annually on internal controls and auditors to report on management's assessment of such controls). Under current law, internal controls play a more direct role in the work of auditors.

control deficiencies. In sum, the nature of the disclosure in this case and the obligations of Deloitte & Touche under the applicable accounting standards simply do not make out a waiver.

Moreover, to construe a company's auditor as an adversary and find a blanket rule of waiver of the applicable work product privilege under these circumstances could very well discourage corporations from conducting a critical self-analysis and sharing the fruits of such an inquiry with the appropriate actors. *See United States v. Arthur Young & Co.,* 677 F.2d 211, 220 (2d Cir.1982), *aff'd in part, rev'd in part,* 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (noting that "a prudent organization might not be perfectly candid with independent auditors once it knew that the information revealed would be reachable" by the Internal Revenue Service). Because this likelihood cannot be empirically documented, the Court's assessment "is thus intuitive and indeed visceral. With that caveat, the court is 'persuaded' that it is likely that corporations will be less willing to engage in this sort of self-investigation if the results of such an investigation can be discovered in parallel civil litigation." *In re LTV Sec. Litig.,* 89 F.R.D. at 612.

This conclusion does not necessarily mean that auditors will be any less independent. In fact, the SEC rules implementing the Sarbanes–Oxley Act specifically contemplate a role for independent auditors in internal investigations that will not compromise their independence. *In re Strengthening the Commission's Requirements Regarding Auditor Independence,* 2003 WL 183801 (S.E.C. Release No. Jan 28, 2003). Instead, the aim should be for corporations to share information with their auditors to facilitate a meaningful review and, ultimately, the availability of more accurate information for the investing public. It is also important to encourage complete disclosure between a company and its auditor, so that auditors are not inadvertently shielded from complete frankness by corporate management, so that they can later claim that they had no knowledge of alleged malfeasance. As one commentator has urged, public policy should seek to eliminate the "perverse incentives" for auditors not to inquire too closely into corporate wrongdoing lest they too be held liable in subsequent securities litigation. Coffee, 84 B.U. L.Rev. at 345. Finally, a waiver of the work product privilege upon disclosure of a document to a company's outside auditor will not meaningfully prevent the situations that have arisen in recent scandals where auditors actively participated in corporate fraud and the ensuing cover-ups. Instead, lawmakers and professional organizations can and have acted to alter the legal, regulatory, and ethical framework in which corporate management and auditors operate. The work product privilege is a separate doctrine that exists to safeguard other values no less precious, those of our adversary system of litigation. We should not sacrifice one to save another, particularly when I believe no such savings will be made.

Thus, this Court must weigh, on the one hand, a litigant's right to "every man's evidence," *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950), with the need to promote complete disclosure between a corporation and its auditors so that both parties can fulfill their necessary roles. When presented with a similar dilemma of competing policy concerns, the Second Circuit reasoned that "one policy has to bend a bit." *Arthur Young & Co.,* 677 F.2d at 220. I therefore find that Allegheny is not entitled to the roadmap to Merrill Lynch's internal investigation and the mental impressions and opinions of its counsel. In this context, Merrill Lynch and Deloitte & Touche were not adversaries contemplated by the work product doctrine and there was no waiver.

It is hereby:

ORDERED that Allegheny's motion for leave to amend is granted, except to the extent that it seeks punitive damages on its fraud counterclaim and demands a jury trial; and it is further

ORDERED that Allegheny's application for production of the two reports discussed herein is denied; and it is further

ORDERED that the Clerk of the Court close this motion.

**SO ORDERED.**